IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| CALDON, INC., | ) |
| Plaintiff, | ) |
| v. | ) CA 04-1951 |
| ADVANCED MEASUREMENT & ANALYSIS GROUP, INC., and WESTINGHOUSE ELECTRIC COMPANY, LLC, | ) |
| Defendants. | ) |

OPINION

COHILL, D.J.

Plaintiff Caldon, Inc. ("Caldon") invents, designs, manufactures, and sells ultrasonic measuring devices for industry, including the nuclear power industry. One of its principal product lines is ultrasonic flow meter systems for use in nuclear power plants. Defendant Advanced Measurement & Analysis Group, Inc. ("AMAG") manufactures a competing line of ultrasonic flow meters, and Defendant Westinghouse Electric Company, LLC ("Westinghouse") markets AMAG's products. Plaintiff has sued the Defendants for unfair competition in violation of the Lanham Act § 43 (a)(2), 15 U.S.C. § 1125 (a), and unlawful attempt to monopolize in violation of the Sherman Antitrust Act, 15 U.S.C. § 2, and seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15 (a).

We have jurisdiction over Plaintiff's claims under 15 U.S.C. § 1121 and 28 U.S.C. § 1331 and 1338 § (a) and (b).

Before the Court are motions to dismiss filed by Defendants AMAG (Doc. 5) and Westinghouse (Doc.8), with supporting briefs and appendices. Plaintiff has filed a brief in opposition to both motions (Doc. 14). Both Defendants have filed reply briefs, to which Plaintiff has also replied. We have also docketed letters and responses thereto. In addition, on May 17, 2006 Westinghouse filed a supplemental brief, to which Caldon has responded. By its supplemental brief (Doc. 20), Westinghouse informed the Court that the AMAG CROSSFLOW

UFM remains the subject of ongoing and pervasive regulatory activity by the Nuclear Regulatory Commission ("NRC"). Therefore, Westinghouse asks that we rule on its motion to dismiss without including its statements that the NRC has on prior occasions approved the AMAG CROSSFLOW UFM technology and the accuracy of that device. This "amendment" to the position previously taken by Westinghouse in its filings has caused the Court considerable delay in its analysis, but we have now resolved these motions without relying on those arguments.

Having now considered the submissions of the parties and the applicable law, for the reasons set forth below, Defendants' motions will be denied.

## I. Background

The following facts are alleged in the complaint and accompanying materials. The parties to this litigation are business competitors. Caldon is in the business of inventing, designing, manufacturing, and selling ultrasonic measuring devices for, *inter alia*, the nuclear power industry. (Compl. at ¶ 4). One of Caldon's principal product lines has been a line of ultrasonic flow meters ("UFMs") for use in nuclear power plants. ("Caldon UFM"). Caldon manufactures and sells the LEFM Check UFM and the LEFM Check Plus. (Compl. at ¶¶ 14-15).

Defendant AMAG manufactures a competing UFM for sale to the nuclear power industry ("the AMAG CROSSFLOW UFM"). (Compl. at ¶ 6). Defendant Westinghouse has an exclusive arrangement to market the AMAG CROSSFLOW UFM. (Compl. at ¶ 7).

These devices provide information used to measure the flow of feedwater and the level of thermal power generated by a nuclear power plant. (Compl. at ¶ 5). Historically, flow measurement systems used in the nuclear power industry to measure and determine a nuclear power plant's power output were considered to be accurate to within an average 2% margin of error. (Compl. at ¶ 10). To account for this margin of error, nuclear power plant operators have been required by the terms of operating licenses issued to them by the Nuclear Regulatory

2

Commission ("NRC") to operate their nuclear power plants so as never to exceed a power level 2% lower than the maximum analyzed design limit ("Analyzed Limit"). (10 C.F.R. 50, Appendix K). This power output level which is 2% lower than the Analyzed Limit is referred to as the "Licensed Power Limit." (Compl. at ¶ 11). Appendix K was amended in June 2000 to permit a smaller degree of uncertainty when justified. (Ex. 5 at 4).

Caldon asserts that its UFMs are far more accurate than the instruments previously used in the nuclear power industry. (Compl. at ¶ 12). Caldon's LEFM 8300, which was designed to be mounted on the external surface of a feedwater pipe, is as an external UFM. It is accurate to a margin of error of 1.0%. (Compl. at ¶ 13). To improve the accuracy of its UFMs, Caldon developed a flow element that would be calibrated in a flow testing facility and then welded into the feedwater pipe itself, thereby removing uncertainties caused by the pipe thickness and other factors. This is the internally mounted LEFM Check UFM, which is accurate to within 0.5% margin of error. ((Compl. at ¶ 14). Caldon subsequently developed an enhanced version of its internally mounted UFM, the LEFM Check Plus, which is accurate to a 0.3% margin of error. (Compl. at ¶ 15).

Defendants have represented that the AMAG CROSSFLOW UFM manufactured and sold by the Defendants is accurate to within a 0.5% margin of error. (Compl. at ¶ 28).

As the NRC has explained, the development of more accurate UFMs leads, in principle, to a reduction in the uncertainty associated with determining the level of thermal power, usually because of increased accuracy in feedwater flow measurement. (June 2004 UFM Task Group Report, Ex. 5 at i). "This uncertainty reduction should allow plants to be operated at increased thermal power while providing reasonable assurance that licensed thermal power is not exceeded." (Ex. 5 at i).

Due to the need to increase electric power generating capacity in the United States, the NRC has been receptive to requests from operators of nuclear power generating stations to "uprate" their power plants by increasing the Licensed Power Limit for their power plants.

(Compl. at ¶ 16). One category of uprate approved by the NRC is "measurement uncertainty recapture ("MUR") power uprates," which are achieved by implementing improved techniques for measuring reactor power output to a higher degree of accuracy than previously possible. (Compl. at ¶ 17).

Under 10 C.F.R. 50, Appendix K, the NRC reviews a UFM's claimed level of accuracy when it receives applications for these exemptions or uprates.

Nuclear power plant operators using a Caldon Check or Check Plus UFM have successfully obtained MUR power uprates from the NRC. The resulting uprates have allowed nuclear power plant operators to increase their Licensed Power Limit by up to 1.7%, and, therefore, to operate within 0.3% of the Analyzed Limit. This results in an increased power generation of 1.7%. (Compl. at ¶ 18).

This is significant because each 0.1% increase in a power plant's Licensed Power Limit has the effect of increasing the revenues from sales of electric power from that plant by approximately $200,000 per year for every 1,000 megawatts of power output. (Compl. at ¶ 19).

By the end of 2000 Caldon achieved substantial sales to approximately 40 operators of nuclear power generating stations, and had annual sales of almost $12,000,000. (Compl. at ¶ 20).

There are approximately 450 operating nuclear power generating plants in the world. (Compl. at ¶ 22). Westinghouse was and continues to be the dominant supplier of nuclear plant products and services to the worldwide nuclear power generating industry, and has the world's largest installed base of operating nuclear power plants. (Compl. at ¶ 30). Caldon alleges that, to prevent it from capturing a significant portion of the market, AMAG and Westinghouse made false statements concerning the accuracy of their AMAG CROSSFLOW UFM and also made false disparaging statements about the accuracy of Caldon LEFM Check and Check Plus UFMs.

**The Accuracy of the AMAG CROSSFLOW UFM**

4

Regarding false claims of accuracy, Caldon avers that AMAG and Westinghouse represented to operators of nuclear electric power generating plants that the AMAG CROSSFLOW UFM was accurate to within a 0.5% margin of error, and that installation of Defendants' UFM would allow a power plant to obtain a power uprate of approximately 1.5% from the NRC . (Compl. at ¶¶ 28-29). The industry accepted Westinghouse's representation of accuracy to within a 0.5% margin of error. (Compl. at ¶ 33). Because of its dominance in the industry, and because the externally mounted AMAG CROSSFLOW UFM had cost and installation advantages over Caldon's LEFM CHECK and CHECK PLUS UFMs, Westinghouse captured the nuclear power market and the AMAG CROSSFLOW UFM displaced the Caldon UFM as the preferred high accuracy UFM for use in the industry. (Compl. at ¶ 32). Plaintiff avers that these representations were false and misleading, because the AMAG flow meter is based on technology which cannot achieve anything approximating the level of accuracy which defendants claimed it could achieve. (Compl. at ¶ 34).

Plaintiff explains that the feedwater being measured by a UFM typically does not flow at a uniform velocity across the pipe, but is affected by various flow disturbances which cause the velocity of the fluid flowing axially down the pipe to vary spatially. The sum total of these variations in the velocity of the feedwater is called the "velocity profile" of the feedwater. (Compl. at ¶ 35). Variations in the velocity profile of the feedwater create a small level of uncertainty in the accuracy of the Caldon UFM, but that uncertainty is within the margin of error of 0.5% for the LEFM check and 0.3% for the LEFM Check Plus. However, velocity profile variation affects the accuracy of an externally mounted UFM such as the AMAG CROSSFLOW UFM to a much greater extent than it affects an internally mounted device, and can create an error in measurement which can be three to five times greater than the 0.5% margin of error claimed by defendants for the AMAG CROSSFLOW UFM. (Compl. at ¶¶ 35-37).

Plaintiff asserts that Westinghouse has repeatedly represented to the nuclear power

5

industry and to potential purchasers of its products that its UFM was not materially affected by variations in feedwater velocity profile, and that this representation is false. (Compl. at ¶¶ 38-39). Westinghouse promoted the AMAG CROSSFLOW UFM as "proven technology," with a 100% success rate." Defendant claimed that the accuracy of the AMAG CROSSFLOW on a single line was 0.4%, and the accuracy of the CROSSFLOW XT UFM was 0.3%. Defendant asserted that the accuracy of its UFM was not materially affected by unexpected variations in the velocity profile of the feedwater. (Compl. at ¶ 55).

Using these false representations, Westinghouse began selling the AMAG CROSSFLOW UFM to Excelon Generating LLC ("Excelon") for use at its Byron and Braidwood Nuclear Power Generating Stations. (Compl. at ¶ 41). On September 29, 2003, Excelon reported that Units 1 and 2 of its Byron, Illinois generating station had been operating in excess of its Licensed Power Limit because of inaccuracies in the measurement of feedwater flow using the AMAG CROSSFLOW UFMs. (Compl. at ¶ 43). These stations had exceeded their Licensed Power Limit by 1.64% and 0.42% respectively. (Compl. at ¶ 44). A supplemental report revised the error percentages up to 1.07% and 1.21%. On September 30, 2003, Excelon reported to the NRC that Unit 2 at its Braidwood Nuclear Power Generating Station had exceeded its Licensed Power Limit due to the AMAG CROSSFLOW UFM, which failed to perform to the claimed level of accuracy. (Compl. at ¶ 45). And on March 30, 2004, Excelon reported that Unit 1 at Braidwood was also operating in excess of its Licensed Power Limit due to inaccuracies in feedwater flow measurement made by an AMAG CROSSFLOW UFM. (Compl. at ¶ 46).

After receiving several reports that various power plants were receiving inaccurate flow measurement data from the AMAG UFMs, and thus were exceeding their Licensed Power Limits, the NRC organized a group called the Ultrasonic Flow Meter Allegation Task Group ("Task Group") to investigate whether the AMAG CROSSFLOW UFM was providing the level of accuracy represented by AMAG and Westinghouse. (Compl. at ¶ 49). The Task Group also

6

reviewed the performance of the Caldon UFMs. (Compl. at ¶ 50). A report issued by the Task Group on June 7, 2004 concluded that the Caldon Check was accurate to a margin of error of 0.4% - 0.5%, and the Caldon Check Plus was accurate to a margin of error of 0.25% - 0.30%. The Task Group was "reasonably confident either UFM will provide the anticipated accuracy when properly operated and maintained by trained personnel." (Compl. at ¶ 51).

The Task Group's report on the AMAG UFMs issued on July 1, 2004, and was critical of Defendants' claims that the UFMs were accurate. The Report stated that "[t] Task Group does not believe the claimed values are adequately substantiated for plant installations." (Compl. at ¶ 52). The Report further found that in some instances, use of the AMAG UFM resulted in extended overpower operation. (Compl. at ¶ 53). The Report noted that concerns about the accuracy of the AMAG CROSSFLOW had arisen in plant installations using this UFM, including Byron and Braidwood. (Compl. at ¶ 54).

It is clear from the supplemental brief submitted by Defendant Westinghouse (Doc. 20) that the NRC is continuing to investigate the accuracy of the AMAG CROSSFLOW UFM.

**Disparagement of the Caldon UFMs**

Caldon also alleges that the Defendants made false and disparaging statements about Caldon's LEFM Check and Check Plus technology. Caldon was formed in 1987 by a former Westinghouse executive who participated in the development of the transit-time technology on which the Caldon UFM was based. (Compl. at ¶¶ 57-58). In 1989, Caldon purchased the rights to this technology from Westinghouse. At that time, Westinghouse considered the technology as a viable, promising technology, with great potential, especially for use in the nuclear power industry. (Compl. at ¶¶ 59-60).

Plaintiff alleges that after Westinghouse began promoting the sale of the AMAG CROSSFLOW UFM, it began a campaign of disparagement against Caldon and the transit-time technology. (Compl. at ¶¶ 61-62). False comments were made in regulatory submissions which were disseminated to customers and potential customers, and in written communications

7

Westinghouse distributed to operators of nuclear power generating stations. (Compl. at ¶ 63).

Caldon has filed claims of unfair competition in violation of the Lanham Act, § 43(a), 15 U.S.C. § 1125(a), and specific intent to destroy competition in the relevant market, monopolization, and attempted monopolization, in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Plaintiff pleads treble damages under 15 U.S.C. § 15(a), the Clayton Act.

## II. Motion to Dismiss Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. In reviewing a motion to dismiss "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir.1989). Dismissal of a complaint is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Langford v. City of Atlantic City*, 235 F.3d 845, 847 (3d Cir.2000) (citing *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996)). The question is not whether the plaintiff will ultimately prevail; instead, it is whether the plaintiff can prove any set of facts consistent with the averments of the complaint which would show the plaintiff is entitled to relief. *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir.1994).

Under this standard a complaint will be deemed sufficient if it adequately puts the defendant on notice of the essential elements of a cause of action. *Nami*, 82 F.3d at 66.

In deciding a motion to dismiss, a court may consider the complaint and documents relied upon in the complaint, as well as matters of public record including authentic reports of an administrative agency. *City of Pittsburgh v. West Penn Power, Co.*, 147 F.3d 257, 259 (3d Cir. 1998); *Oshiver, Fishbein, Sedran and Berman*, 38 F.3d 1380 (3d Cir. 1994).

The dismissal standard is higher in antitrust cases than generally. *Rolite v.*

*Wheelabrator Envir. Systems, Inc.*, 958 F.Supp. 992, 995 (E.D.Pa. 1997). *See, also Lum v. Bank of Am.*, 361 F.3d 217, 228 (3d Cir.2004) (explaining that "in antitrust cases . . . dismissal prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly)" (quoting *Hosp. Bldg. Co. v. Trustees of the Rex Hosp.*, 425 U.S. 738,746 (1976))). Nonetheless, the facts underlying the elements of an antitrust claim must be pled with specificity. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n. 17 (1983).

### III. Analysis

#### A. Doctrine of Primary Jurisdiction

Defendants first assert that the complaint must be dismissed under the doctrine of primary jurisdiction, because Caldon's claims are based on issues that have been and are still being adjudicated by the NRC and which remain within the agency's jurisdiction. Defendants argue that the NRC is already asserting its primary jurisdiction over the issues raised by Plaintiff's claims.

The doctrine of primary jurisdiction "is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties." *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303 (1976) (quoting *United States v. Western Pacific R. Co.*, 352 U.S. 59, 63 (1956)). Under this doctrine, a court is required to transfer an issue within a case that involves expert administrative discretion to the federal administrative agency charged with exercising that discretion for initial decision. *Richman Bros. Records, Inc. v. U.S. Sprint Communications Co.*, 953 F.2d 1431, 1435 (3d Cir. 1991). The proper procedure in such a case is dismissal of the complaint without prejudice, or, if such dismissal could disadvantage the plaintiff, the court may instead stay the claims pending agency resolution of the administrative issue.

The Supreme Court has explained that claims should be referred to an agency when the issue involves technical questions of fact uniquely within the expertise and experience of an

9

agency, such as matters turning on an assessment of industry conditions such as rates or tariffs. *Nader*, 426 U.S. at 304. *See, e.g. Danna v. Air France*, 463 F.2d 407 (C.A.2 1972); *Southwestern Sugar & Molasses Co. v. River Terminals Corp.*, 360 U.S. 411, 417-18 (1959).

This case presents no such technical questions. Although Westinghouse construes the complaint in this matter as asking "this Court to second-guess, and indeed overrule, determinations of the NRC on exceedingly complex and unresolved scientific issues . . . ." we do not agree with this characterization of plaintiff's claims. (Def.'s Br. Doc. 9 at 4). While it is clear that the NRC continues to evaluate broader questions of the accuracy of Defendants' UFM, the issue before us is whether, prior to and during this process, the Defendants have misrepresented the accuracy of their UFM and disparaged Plaintiff's device so as to violate the Lanham and Sherman Acts. These questions of misrepresentation and disparagement are not going to be decided by the NRC. They are issues within the competence of this Court.

The NRC's conclusions may well affect Defendants' defense against Caldon's claims, as well as any arguments made in motions for summary judgment in this case, but this does not affect our competence to consider Plaintiff's claims.

### B. *Noerr-Pennington* Immunity

Defendants also assert that Caldon's claims are barred by the *Noerr-Pennington* doctrine. Under this doctrine, the United States Supreme Court has carved out a limited immunity from the antitrust laws for individual or group action taken to influence legislative, executive, administrative, or judicial decisions, as long as that action is not undertaken solely with an anticompetitive purpose. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 135-36 (1963).

Paragraph 63 of the complaint in this matter avers that the defendant made certain false and disparaging statements about the Caldon UFMs in regulatory submissions to the NRC, and that these were "widely disseminated to customers and potential customers and in written

10

communications distributed by Westinghouse to operators of nuclear power generating stations." (Compl. at ¶ 63). Defendants argue that statements made in regulatory submissions are protected by the *Noerr-Pennington* doctrine and must be dismissed.

However, defendants ignore the thrust of Plaintiff's Sherman Act and Lanham Act claims, which is that the statements complained of were allegedly provided to consumers of the UFM devices offered by both the plaintiff and the defendants. Caldon avers that the Defendants made false representations to operators of nuclear plants regarding the efficacy of the AMAG UFM (Compl. at ¶ 28), as well as to customers and potential customers (Compl. at ¶ 29). Plaintiff further asserts that the Defendants made certain false and disparaging claims about the Caldon UFM, and that these false claims were made in regulatory submissions which were "widely disseminated to customers and potential customers and in written communications distributed by Westinghouse to operators of nuclear power generating stations." (Compl. at ¶ 63).

We agree with Caldon that such claims were not only made in regulatory submissions, but were made to private entities within the nuclear industry, and that *Noerr-Pennington* offers defendants no immunity from suit in this case.

### C. Antitrust Standing

Section 4 of the Clayton Act provides treble damages for "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws. . . ." 15 U.S.C. § 15. As a threshold issue, we must address Defendants' assertion that Caldon lacks standing to bring its antitrust claims. The antitrust standing inquiry "is not a black-letter rule, but rather is 'essentially a balancing test comprised of many constant and variable factors. . . .'" *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 264-65 (3d Cir. 1998) (quoting *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 964-65 (3d Cir. 1983)). A plaintiff must show that (1) he has suffered the type of injury the antitrust laws were intended to prevent; and (2) the injury flows from that which makes defendant's acts unlawful. *Gulfstream III*

11

*Assoc., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993). Courts have set forth a five-factor balancing test to evaluate whether a plaintiff has antitrust standing. The court must consider (1) the causal connection between the antitrust injury and the harm to the plaintiff and the intent by the defendant to cause that harm; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages. *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 537-545 (1983); *Barton & Pittinos, Inc. v. SmithKline Beecham Corp.*, 118 F.3d 178, 181 (3d Cir. 1997).

Defendants argue that Caldon has failed to allege the second and third elements, antitrust injury and direct causation.

An antitrust injury is "an injury of 'the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anti-competitive effect either of the violation or of anti-competitive acts made possible by the violation." *Eichorn v. AT & T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).

Antitrust standing "goes beyond the Constitutional standing requirement of 'injury in fact' and is not satisfied by the mere allegation of a causal connection between an alleged antitrust violation and harm to the plaintiff." *Mathews v. Lancaster Gen. Hosp.*, 883 F.Supp. 1016, 1045 (E.D.Pa. 1995), *aff'd*, 87 F.3d 624 (3d Cir. 1996). In the context of determining antitrust standing, causation requires a showing that the defendants' violation was both a "but for" cause of the injury, and that it was the proximate cause. *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268 (1992). An antitrust plaintiff must show that "the challenged conduct affected the prices, quantity or quality of goods or services" and not just his own welfare. *Mathews*, 87 F.3d at 641 (quoting *Tanis Bros., Inc. v. Ford Motor Co.*, 952 F.2d

715, 728 (3d Cir. 1991)).

With regard to antitrust injury, Defendants argue that Caldon has failed to aver any harm to the competitive process, but has only pled harm to itself. Defendants assert that any alleged inaccuracies actually increased the revenues of customer power plants because the plants' power limits were increased by operating outside their licensed limits. (Westinghouse Br. at 43).

Caldon asserts that, as a result of defendants' misrepresentations and disparagement, the quality of flow measurements in nuclear plants using the AMAG UFM has been adversely affected. The complaint alleges that false claims about the accuracy of the AMAG UFM resulted in sales to Excelon, for use at its Byron and Braidwood Nuclear Power Generating Stations, and that it became clear to Excelon that the AMAG UFM was not performing as well as expected in the field. (Compl. at ¶ 41-48). It alleges that these false representations have misled and deceived the operators of nuclear power plants. (Compl. at ¶69). The logical inference from such allegations is that the operators of these power plants have been required to take some actions, at some expense, because of the Defendants' UFMs, and we must reject defendants' argument that the alleged misrepresentations have actually been good for the industry.

Moreover, Caldon is Defendants' **only** competitor in the relevant market, and it has alleged that Defendants' conduct is intended to destroy this competition. (Compl. at 73, 74). The inference that may be drawn from these averments is that Defendants' conduct is attempting to destroy **all** competition in the market, which is certainly the sort of injury the antitrust laws were designed to remedy.

Turning to causation, Defendants contend that Plaintiff's allegation that the AMAG CROSSFLOW UFM offers "certain cost and installation advantages" over Caldon's UFMs

13

defeats causation. (Doc. 9 at 40).

We do not agree. When read in its entirety and in the context of other allegations in the complaint, Plaintiff alleges that Defendants' misrepresentations caused the injury:

> 32. Because of Westinghouse's dominant position in the industry and because the externally mounted AMAG CROSSFLOW UFM had certain cost and installation advantages over Caldon's LEFM CHECK and CHECK PLUS UFMs, Westinghouse quickly succeeded in capturing the nuclear power market for the AMAG CROSSFLOW UFM, which displaced the Caldon UFM as the preferred high accuracy UFM for use in that industry.
>
> 33. The key to Westinghouse's success in selling the AMAG CROSSFLOW UFM was the acceptance in the industry of Westinghouse's representation that the AMAG UFM was accurate to within a 0.5% margin of error.
>
> 34. However, AMAG and Westinghouse's representations regarding the accuracy of the AMAG CROSSFLOW UFM were false and misleading because the AMAG flow meter is based on technology which cannot achieve anything approximating the level of accuracy which AMAG and Westinghouse claimed it could achieve.

Compl. ¶¶ 32-34.

We conclude that Caldon has sufficiently averred an antitrust injury and causation. Balancing these factors with the other elements required to show antitrust standing, which are uncontested, we are satisfied that the complaint withstands a motion to dismiss on this issue and that Caldon has standing to pursue its antitrust claims.

### D. Sherman Act Claim

Having determined that Caldon has standing to pursue its antitrust claim, we now turn to defendants' argument that this claim must nevertheless be dismissed for failure to state a claim under Section 2 of the Sherman Act, because it has failed to allege monopolization or attempted monopolization. 15 U.S.C. § 2.

Section 2 of the Sherman Act prohibits monopolization and attempted monopolization. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). To state a claim of

monopolization under Section 2, a plaintiff must allege " (1) the possession of monopoly power in the relevant market; and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966).

The plaintiff bears the burden of alleging and proving a properly defined relevant market. *Pastore v. Bell Tel. Co. Of Pa.*, 24 rf.3d 508, 513 (3d Cir. 1994). The relevant market includes both a product market and a geographic market. *Pa. Dental Ass'n v. Medical ser. Ass'n of Pa.*, 745 F.2d 248, 260-61 (3d Cir. 1984).

Westinghouse and AMAG contend that Caldon has failed to allege that Westinghouse has market power in the relevant product market. We do not agree.

The complaint avers the following:

> 73. Defendants AMAG and Westinghouse engaged in the above-described acts and conduct with the specific intent to destroy Caldon as their only competitor in the high accuracy UFM nuclear power generating market (the "Relevant Market") so that the Defendants could monopolize that market with the AMAG CROSSFLOW UFM.. (Compl. at ¶ 73).

> 74. As the dominant supplier of products and services to the nuclear power generating industry and as Caldon's sole competitor in the Relevant Market, Westinghouse, on behalf of itself and AMAG, possesses market power sufficient to create a dangerous probability of monopolization of the Relevant Market. (Compl. at ¶ 74).

> 75. Defendants' above-described acts and predatory conduct when coupled with the specific intent to destroy competition in the Relevant Market from the Caldon UFM and the dangerous probability of monopolizing that market, constitutes an unlawful attempt to monopolize (.) (Compl. at ¶ 75).

Plaintiff has also alleged that Defendants' acts have caused injury. (Compl. at ¶¶ 32, 64, 65, 76).

We conclude that the complaint puts the Defendants on notice of the relevant product market, and we will deny the motions to dismiss as to this issue.

We also conclude that Caldon has stated a claim of attempted monopolization under

15

Section 2 of the Sherman Act. To establish such a claim, a plaintiff must allege (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. *Spectrum Sports,* 506 U.S. at 459; *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 442 (3d Cir. 1997).

Westinghouse asserts that Caldon's definition of the product market is too vague to support a claim of attempted monopolization. We find that the complaint is sufficiently specific in this regard to survive a motion to dismiss.

The complaint avers the following:

> 73. Defendants AMAG and Westinghouse engaged in the above-described acts and conduct with the specific intent to destroy Caldon as their only competitor in the high accuracy UFM nuclear power generating market (the "Relevant Market") so that the Defendants could monopolize that market with the AMAG CROSSFLOW UFM.. (Compl. at ¶ 73).
>
> 74. As the dominant supplier of products and services to the nuclear power generating industry and as Caldon's sole competitor in the Relevant Market, Westinghouse, on behalf of itself and AMAG, possesses market power sufficient to create a dangerous probability of monopolization of the Relevant Market. (Compl. at ¶ 74).
>
> 75. Defendants' above-described acts and predatory conduct when coupled with the specific intent to destroy competition in the Relevant Market from the Caldon UFM and the dangerous probability of monopolizing that market, constitutes an unlawful attempt to monopolize (.) (Compl. at ¶ 75).

Plaintiff has also alleged that Defendants' acts have caused injury. (Compl. at ¶¶ 32, 64, 65, 76).

We conclude that the complaint states a claim for attempted monopolization and we will deny Defendants' motions to dismiss on this point.

### E. Lanham Act Claim

Finally, Defendants argue that Caldon has failed to state a claim for relief under Section 43(a) of the Lanham Act, which provides, in pertinent part, as follows:

16

> Any person who, on or in connection with any goods or services . . . uses in commerce any . . . false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities . . . of his or her or another person's goods, services or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

To state a claim under Section 43(a), a plaintiff must allege (1) that the defendant has made false or misleading statements; (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) that the deception is material in that it is likely to influence purchasing decisions; (4) that the advertised goods traveled in interstate commerce; and (5) that there is a likelihood of injury to the plaintiff. *Ditri v. Coldwell Banker*, 954 F.2d 869, 872 (3d Cir. 1992) (citing *U.S. Healthcare v. Blue Cross of Gr. Philadelphia*, 898 F.2d 914, 922-23 (3d Cir. 1990)).

As a threshold matter, Defendants argue that this claim must be dismissed because the Plaintiff has not pled that the representations were made in commercial advertising or promotion. (AMAG Br. at 19; Westinghouse Br. at 31-34). Westinghouse insists that Caldon must plead that a particular advertisement or promotion violates the Lanham Act.

In deciding whether representations were commercial advertising or promotion within the Lanham Act, courts in this jurisdiction apply the test from *Seven-Up v. Coca-Cola Co.*, which defines "commercial advertising or promotion" as "1) commercial speech; (2) by a defendant in commercial competition with the plaintiff; (3) for the purposes of influencing consumers to buy the defendant's goods or services; and (4) that is sufficiently disseminated to the relevant purchasing public to constitute advertising or promotion within the industry." 86 F.3d 1379, 1384 (5th Cir.1996); *Synygy, Inc. v. Scott-Levin, Inc.*, 51 F.Supp.2d 570, 576 (E.D. Pa. 1999), *aff'd*, 229 F.3d 1139 (3d Cir. 2000) (adopting *Seven-Up* test).

We find that this test has been met.

17

The complaint alleges that the Defendants misrepresented their own product and disparaged Caldon's. Misrepresentations concerning "another person's goods, services, or commercial activities" as well as misrepresentations about one's own products are expressly actionable under Section 43(a)(2) of the Lanham Act. (15 U.S.C. § 1125(1)(B)). Courts have held that commercial speech under the statute encompasses more than just a traditional advertising campaign. *Seven-Up*, 86 F.3d at 1384. *See, also Birthright v. Birthright, Inc.*, 827 F.Supp. 1114, 1137-38 (D.N.J. 1993). However, misrepresentations made in only in regulatory submissions do not qualify as commercial speech under the Lanham Act. *See In re Warfarin Sodium Antitrust Litig.*, No. MDL 98-1232-SLR, 1998 WL 883469, at *13 n. 13 (D.Del. Dec. 7, 1998), *rev'd on other grounds*.

Plaintiff responds that the disparaging statements and misrepresentations were not only made in submissions to the NRC, but were publicized to the industry in general. Caldon reminds us that the parties to this litigation are the sole competitors in an industry of only approximately 450 operators of nuclear power plants worldwide. Regarding Defendants' alleged misrepresentations about its own UFMs, Caldon directs us to the complaint at ¶ 38: "Westinghouse has repeatedly represented to the nuclear power industry and potential purchasers of its products that measurements with the AMAG UFM were not materially affected by variations in feedwater velocity profile, and claimed to have secret proprietary information supporting its claim." Compl. at ¶ 38.

Regarding the allegedly disparaging statements, the complaint alleges at ¶ 63 that "false and disparaging claims were made in regulatory submissions which were widely disseminated to customers and potential customers and in written communications distributed by Westinghouse to the operators of nuclear power generating stations." Compl. at ¶ 63.

Caldon has sufficiently alleged that Defendants statements were made to the broader market for these products, and not only to the NRC.

Defendants further argue that Caldon cannot show that Defendants' claims are literally

18

false. The Lanham Act is violated by a communication that is either literally false, as well as by one that is literally true or ambiguous, but with a tendency to deceive potential customers. *Novartis Consumer Health, Inc. v. Johnson & Johnson*, 290 F.2d 578, 586 (3d Cir. 2002).

Defendants' position on this issue in their original brief is that the NRC's prior determinations have confirmed the accuracy of the device and its technology.

We reject this argument based on Defendants' own admission to the Court that the NRC is still evaluating the accuracy of the AMAG CROSSFLOW. For the same reason, we reject Defendants' claims that the NRC has accepted the technology upon which the AMAG CROSSFLOW is based, and that the NRC has confirmed the UFM's capabilities. The NRC continues to evaluate the AMAG CROSSFLOW UFM.

Moreover, Caldon has averred literal falsity so as to withstand a motion to dismiss. The complaint alleges that Defendants' representations that the AMAG CROSSFLOW UFM was accurate to within 0.5% margin of error are false and misleading.

> 33. The key to Westinghouse's success in selling the AMAG CROSSFLOW UFM was the acceptance in the industry of Westinghouse's representation that the AMAG UFM was accurate to within a 0.5% margin or error.

The complaint further alleges that "Westinghouse promoted the AMAG CROSSFLOW UFM to the nuclear power industry" by making false claims and representations that the AMAG CROSSFLOW UFM represented "proven technology;" that it has a "100% success rate"; that accuracy on a single line is 0.4%; that the accuracy of the AMAG CROSSFLOW XT UFM is 0.3%; and that accuracy of the AMAG CROSSFLOW UFM was not materially affected by unexpected variations in the velocity profile of feedwater. (Compl. at ¶ 55).

We find that Plaintiff has stated a claim of literal falsity, and Defendants' motions to dismiss on this issue will be denied.

If a claim for literal falsity cannot be proved, to establish a violation of Section 43(a) of

19

the Lanham Act a plaintiff must show actual deception or a tendency to deceive a substantial portion of the intended audience. *Johnson & Johnson-Merck Consumer v. Rhone-Poulenc Rorer Pharm., Inc.*, 19 F.3d 125 (3d Cir. 1994). Defendants assert that Caldon cannot establish that Defendants' representations have deceived a substantial portion of the intended audience.

We disagree. We find that the allegations at ¶¶ 33, 34, 39, 41 and 55, set forth herein, sufficiently allege that customers purchased the AMAG CROSSFLOW UFM based upon Defendants' misrepresentations.

We conclude that Caldon has stated a claim of unfair competition under Section 43(a) of the Lanham Act, and will deny Defendants' motions to dismiss this claim.

### IV. Conclusion

For the reasons set forth above, we will deny the motions to dismiss filed by defendant Advanced Measurement & Analysis Group, Inc. (Doc. 5) and Westinghouse Electric Company, LLC (Doc. 8) in their entirety. An appropriate Order follows.

June 7, 2007
Date

Maurice B. Cohill, Jr.
Senior United States District Judge

20