**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DOCA COMPANY, as successor to | ) | |
| Caldon Company Limited Partnership, | ) | |
| | ) | |
| Plaintiff and | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Civil No. 04-1951 |
| | ) | |
| WESTINGHOUSE ELECTRIC | ) | |
| COMPANY, LLC, and ADVANCED | ) | |
| MEASUREMENT & ANALYSIS | ) | |
| GROUP, INC. | ) | |
| | ) | |
| Defendants and | ) | |
| Counterclaim Plaintiffs. | ) | |

## OPINION AND ORDER ON MOTION FOR LEAVE
## TO FILE AN AMENDED COMPLAINT

Plaintiff DOCA Company, as successor to Caldon Company (hereinafter referred to as

"DOCA") has filed a Motion for Leave to File an Amended Complaint and Corrected Replies to

Counterclaims. ECF No. 146. Defendant Westinghouse Electric Company LLC (hereinafter

referred to as "Westinghouse") opposes the motion. For the reasons stated below we will grant

DOCA's Motion.

### I.      Background

On December 29, 2004, DOCA filed a two-count Complaint against codefendants

Westinghouse and Advanced Measurement & Analysis Group, Inc. (hereinafter referred to as

"AMAG") alleging unfair competition in violation of the Lanham Act § 43 (a)(2), 15 U.S.C. §

1125(a), and unlawful attempt to monopolize in violation of the Sherman Antitrust Act, 15

U.S.C. § 2. DOCA's initial Complaint alleged that Westinghouse and AMAG made false and

misleading statements to prospective customers, causing potential customers to purchase AMAG

CROSSFLOW UFMs rather than DOCA UFMs.  Consequently, in its original Complaint, DOCA seeks treble damages under Section 4 of the Clayton Act, 15 U.S.C. §15(a).

On March 29, 2005, Westinghouse filed a motion to dismiss, which we denied.  ECF No. 23.  Accordingly, Westinghouse filed its Answer to the Complaint and filed counterclaims against DOCA under Section 43(a) of the Lanham Act and Section 2 of the Sherman Antitrust Act.  ECF No. 28.  Discovery was initially set to close on May 1, 2008.  ECF No. 38.  After numerous filings and Orders not relevant to the instant Motion, discovery was extended until August 1, 2008.  ECF No. 56.  Following a Joint Motion for Extension of Time to Complete Discovery, discovery was further extended to June 1, 2009.  ECF No. 61.  Since then, discovery has been extended six more times, with the latest date being July 31, 2011.  ECF No. 76, 113, 121, 144, 176, 238.

On July 30, 2010, DOCA filed the instant motion.  At the time, July 30, 2010 was the date discovery was set to close; however, prior to July 30, 2010,  it was apparent to the Court and the parties that discovery would again be extended.  Westinghouse filed a Brief in Opposition to DOCA's motion (ECF No. 166), to which DOCA filed a Reply (ECF No. 182).  In addition, Westinghouse filed a Sur-Reply Brief (ECF No. 188) and a Supplemental Brief (ECF No. 253). All of the pleadings related to DOCA's motion were originally filed under seal.  However, all of these pleadings (as well as numerous others) have been unsealed following our Opinion and Order on DOCA's Motion to Unseal.  Op. & Order on Motion to Unseal, July 8, 2011, ECF No. 246.  Accordingly, DOCA's Amended Complaint will also not be filed under seal.

Attached as Exhibit 1 to DOCA's Motion for Leave to File an Amended Complaint is DOCA's "Proposed Amended Complaint." Ex. 1 to ECF No. 146. On June 23, 2011, DOCA filed a motion requesting that it be permitted to substitute a "Corrected Amended Complaint" for the "Proposed Amended Complaint." ECF No. 241. We granted this motion. ECF No. 261.

As we noted when we permitted the substituted Amended Complaint, Westinghouse's briefs filed in response to the motion to substitute present substantive arguments opposing the filing of the substituted amended complaint. Accordingly, where relevant we consider Westinghouse's arguments filed in those briefs (ECF Nos. 244, 245, & 258), as well as DOCA's response to Westinghouse (ECF No. 257), as arguments in opposition to, and in support of, the instant motion.

Because of the substitution, the Amended Complaint under consideration here is the "Corrected Amended Complaint" attached as Exhibit 2 to ECF No. 246. In the Amended Complaint, DOCA seeks to add a new allegation that Westinghouse engaged in "deliberate misconduct" and fraud under 10 C.F.R. § 50.5 in its communications to the Nuclear Regulatory Commission (the "NRC"). The Amended Complaint also asserts two new Connecticut state law claims: (1) Interference with Prospective Economic Advantage, a Connecticut common law claim (Count 3); and (2) Violations of Connecticut Unfair Trade Practices Act (Count 4). DOCA also seeks compensatory and punitive damages under the state law claims. Finally, the Amended Complaint makes the following changes relevant to the instant motion:

1. Changes the definition of the Relevant Market from "high accuracy UFM nuclear power generating market" to "**the MUR uprate Market**" in Paragraph 142.

2. Changes Paragraph 153 to include the additional bolded language: "unlawful attempt to monopolize**, and a combination and/or conspiracy to monopolize,** within the meaning of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2."

## II.     Federal Rule of Civil Procedure 15

Rule 15 governs amended pleadings.  A party may either amend once as a matter of course as long as it is filed within 21 days of service or by leave of court.  Fed. R. Civ. P. 15(a)(1)(A) & (a)(2).  If a party is not seeking to amend its pleading as a matter of course pursuant to Rule 15(a)(1), then a party may only amend its pleading either by first obtaining the opposing party's permission or by seeking leave of court.  Fed. R. Civ. P. 15(a)(2).  This liberally interpreted rule instructs that "[t]he court should feely give leave when justice so requires."  Id.  In Foman v. Davis, the United States Supreme Court stated as follows:

> In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'

371 U.S. 178, 182 (1962).

The United States Court of Appeals for the Third Circuit has applied Foman in a manner that denies leave only when the specific and enumerated factors identified by the Supreme Court give rise to injustice towards the opposing party.  Arthur v. Maersk, Inc., 434 F.3d 196, 203 (3d Cir. 2006).  Thus, although Rule 15(a) directs the court to allow an amendment "when justice so requires," a court must deny leave when an amendment is futile or results in undue delay or prejudice.  Foman, 371 U.S. at 182.

While the presence of any one of these factors can be grounds for denial of an amendment, the Third Circuit has viewed "prejudice to the non-moving party" as the most significant factor.  Cornell & Co., Inc. v. Occupational Safety & Health Rev. Comm'n, 573 F.2d 820, 823 (3d Cir. 1978).  A simple claim of prejudice is insufficient grounds for denial; instead, the non-moving party "must show that it was unfairly disadvantaged or deprived of the

opportunity to present facts or evidence which it would have offered had the  .  .  .  amendments been timely." <u>Bechtel v. Robinson</u>, 886 F.2d 644, 652 (3d Cir. 1989).

*Relation Back*

Rule 15(c) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out…in the original pleading." Fed. R .Civ. P. 15(c)(1)(B). The Third Circuit has instructed that "amendments that restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct, transaction or occurrence in the preceding pleading fall within Rule 15(c)." <u>Bensel v. Allied Pilots Ass'n.</u>, 387 F.3d 298, 310 (3d Cir. 2004) (citations omitted). Westinghouse only claims that the proposed amendments are untimely and futile under Rule 15(a) and does not dispute that the proposed amendments relate back if found proper under Rule 15(a). Therefore, if the proposed Amended Complaint is found to be timely under Rule 15(a), we will conclude that it relates back to the original complaint pursuant to Rule 15(c)(1)(B).

### III.    Discussion

Westinghouse first argues that DOCA's motion to amend its complaint should be denied because DOCA unduly delayed seeking leave to amend. Westinghouse argues that the delay in seeking leave to amend is prejudicial to Westinghouse because DOCA has radically altered its theory of liability, because DOCA deliberately delayed seeking leave to amend its complaint for nearly a year and a half, and because the delay prejudiced Westinghouse in discovery.

Next, Westinghouse argues that permitting DOCA to amend its Complaint is futile because DOCA's claims would not survive a motion to dismiss. Westinghouse asserts that the state law claims are impliedly preempted. Westinghouse also argues that DOCA's state law

claims are futile when the correct state law is considered under a choice of law analysis. Finally, Westinghouse argues that all of DOCA's claims are barred because the NRC has primary jurisdiction. We will address Westinghouse's arguments in turn.

**A. Undue Delay and Prejudice towards Defendant**

Westinghouse argues that under Rule 15(a) DOCA's motion to amend its complaint is unduly delayed and therefore highly prejudicial for three principal reasons: (1) the Amended Complaint offers a novel theory of liability from the theory asserted in the original Complaint; (2) DOCA allegedly had the opportunity to file the Amended Complaint one year and five months prior to the actual filing date; and (3) the delay disabled Westinghouse in the discovery process. Def.'s Br. Opp'n. 7, 9–17. DOCA, however, maintains that (1) the filing of the motion to amend its complaint is timely and proper pursuant to Rule 15(a) and Rule 11; (2) the theory of liability in the Amended Complaint is not new but rather an extension of the theory listed in the original Complaint; and (3) if any party is prejudiced in the discovery process because of the Amended Complaint it is DOCA, not Westinghouse. Pl.'s Reply Br. 3–6.

**1. DOCA's Assertion of "Fraud on the NRC"**

According to Westinghouse, the Amended Complaint includes an alleged new theory of liability claiming that Westinghouse made "fraudulent representations and omissions" to the NRC, thus amounting to "deliberate misconduct" pursuant to 10 C.F.R. § 50.5. Def.'s Br. Opp'n. 10. Westinghouse asserts that the theory in the initial Complaint, however, centers on false statements made to *customers* and *potential customers* about the AMAG CROSSFLOW UFM. Id. at 9-10.

A theory of liability different from that asserted in the original complaint can constitute undue prejudice where the new theory requires "'additional discovery, cost, and preparation to

defend against new facts or new theories.'" EEOC. v. Hussey Copper Ltd., 2009 WL 918298, at *1 (W.D.Pa. April 2, 2009), quoting Cureton v. NCAA, 252 F.3d 267, 273 (3d Cir. 2001). However, courts most often acknowledge the new theory limitation to filing an amended complaint when Plaintiff seeks leave after summary judgment motions have been filed. Laurie v. Nat'l Passenger R.R. Corp., 105 F.App'x 387, 392 (3d Cir. 2004).

DOCA does not dispute Westinghouse's overall understanding of the "Fraud on the NRC" theory of liability. However, DOCA argues that this theory is not novel but rather a more detailed allegation pertaining to something that has been at issue since the initial complaint was filed – Westinghouse's communications to the NRC. Pl.'s Reply Br. 3. In support of its argument, DOCA points to several statements made by Westinghouse in its Motion to Dismiss Brief filed in 2005. DOCA notes that Westinghouse, in its brief, acknowledged that DOCA's "claims under the Lanham and Sherman Acts are predicated on statements made to the NRC." Id. at 4 (citing Docket No. 9 at p. 26). Furthermore, DOCA highlights sections where Westinghouse explains the NRC regulatory process to include Westinghouse's submission of reports to the NRC and the NRC's subsequent review and eventual approval. Pl.'s Reply Br. 4 (citing Docket No. 9 at p. 9–18). Finally, DOCA emphasizes that Westinghouse acknowledged that DOCA's original Complaint concerned "allegedly disparaging statements [ ] made to the NRC 'in regulatory submissions.'" Pl.'s Reply Br. 4 (citing Docket No. 9 at p. 4, 27). According to DOCA, these statements demonstrate that Westinghouse knew since the filing of the initial Complaint that Westinghouse's communications with the NRC were a part of this case. Pl.'s Reply Br. 4.

We agree with DOCA. In the original Complaint, DOCA alleged that Westinghouse violated the Lanham Act, 15 U.S.C. § 1125(a) and the Sherman Antitrust Act, 15 U.S.C. § 2, by

making false statements to customers and potential customers.  Compl. ¶¶ 66–76.  In the

Amended Complaint, DOCA alleges that Westinghouse engaged in the exact same action –

making false statements.  Pl.'s Mot. for Leave to File an Am. Compl. & Corrected Replies to

Countercl., Ex. 1, ¶¶135–56.  The only difference in the "Fraud on the NRC" theory of liability

is to whom Westinghouse made the statements.  This slight change in theory does not affect the

underlying elements for Lanham Act and Sherman Antitrust violations.

A Lanham Act violation occurs when "any person who, on or in connection with any

goods or services, or any container for goods, uses in commerce any word, term, name, symbol,

or device, or any combination thereof, or any false designation of origin, false or misleading

description of fact, or false or misleading representation of fact, which … in commercial

advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin

of his or her or another person's goods, services, or commercial activities."  15 U.S.C. §

1125(a)(1)(B).  Significantly, missing from the elements is any requirement that distinguishes to

whom the false fact is conveyed.  Instead, the law is primarily concerned with the fraudulent act

itself.

Similarly, a Sherman Antitrust violation does not turn on the question of who is

defrauded.  Instead, a person contravenes the Sherman Antitrust Act when he or she

"monopolize[s], or attempt[s] to monopolize, or combine[s] or conspire[s] with any other person

or persons, to monopolize any part of the trade or commerce among the several States, or with

foreign nations…."  15 U.S.C. § 2.  Here the focus is whether Westinghouse acted in a manner

that suggests they attempted to monopolize the UFM market.

Consequently, DOCA's theory regarding false statements to customers and its theory

regarding false statements to the NRC are similar. Under both theories DOCA must show

virtually the same facts. DOCA's main allegation under the "Fraud on the NRC" theory of liability is that the CROSSFLOW Topical Report Westinghouse submitted to the NRC only included data derived from favorable test results supporting Westinghouse's contention that their UFM could operate at an uncertainty of ±0.5% or less. *See* Pl.'s Am. Compl., at ¶¶ 36– 43. As a result, DOCA claims that Westinghouse failed to submit subsequent test results that would have challenged the favorable results. Id. at ¶¶ 44–56. However, if Westinghouse had disclosed the unfavorable test results, DOCA alleges that Westinghouse most likely would not have received approval and therefore would not have been able to make false statements to customers. Thus, because DOCA's "Fraud on the Customers" theory is factually related to its "Fraud on the NRC" theory, we see no undue prejudice to Westinghouse.

Even if the "Fraud on the NRC" theory of liability was characterized as completely independent of DOCA's original theory of liability, we would still allow the amendment. In Matarazzo v. Friendly Ice Cream Corp., the court for the Eastern District of New York, relying on Second and Eighth Circuit decisions, noted, "[e]ven though it is predicated upon a different theory, an amendment should be permitted in the absence of the injection of any new issues requiring new and extensive preparation detrimental to the speedy resolution of the case and prejudicial to the defendant." 70 F.R.D. 556, 559 (E.D.N.Y. 1976), citing Middle Atlantic Utilities Co. v. S.M.W. Development Corp., 392 F.2d 380, 385-86 (2d Cir. 1968); Izaak Walton League v. St. Clair, 497 F.2d 849, 854 (8th Cir.), *cert denied*, 419 U.S. 1009 (1974). The Matarazzo court noted that the crucial factor is "whether the defendant has been given fair notice in the original complaint of the potential claims set forth in the proposed amendment and whether it will be deprived of any protection otherwise available to it." Matarazzo, 70 F.R.D. at 559. We agree that the crux of whether the alleged new theory of liability is prejudicial to

Westinghouse turns on whether Westinghouse received notice that it could be held liable for Lanham Act and Sherman Antitrust violations prefaced on false statements made to the NRC.

Here, DOCA's "fraud on the NRC" theory of liability arises out of a common nucleus of operative facts. These common facts include Westinghouse's submissions to the NRC, the subsequent approval of Westinghouse's Topical report, and ultimately the false statements made to customers and potential customers. Westinghouse was put on notice that claims alleging Fraud on the NRC may arise during this case.

In addition to Westinghouse's assertion that the "Fraud on the NRC" theory of liability is novel, Westinghouse also argues that the Amended Complaint adds a new legal theory consisting of "conspiracy to monopolize." Def.'s Br. Opp'n to Pl.'s Mot. to Substitute Proposed Am. Compl. 1 (ECF No. 244). Westinghouse argues that the new language, "conspiracy to monopolize," is prejudicial because it will require additional discovery of third-party witnesses "about whether the existence of the commercial relationship between AMAG and Westinghouse injured competition by restricting the ability of those customers or potential customers to freely choose a DOCA UFM." Id. at 6. DOCA, however, argues that this change does not form a new legal theory, but rather "states a conclusion that naturally arises" from previously plead allegations. Pl.'s Reply to Def.'s Br. Opp'n. to Pl.'s Mot. to Substitute Proposed Am. Compl. 8 (ECF No. 257).

We agree with DOCA. First, the inclusion of "conspiracy to monopolize" does not create a new legal theory. A Sherman Antitrust violation, 15 U.S.C. § 2, requires that a person "monopolize, attempt to monopolize, or combine or conspire" with another person to monopolize commerce. The addition of the words "conspiracy to monopolize" does not add a new theory, but rather conforms to the facts that have been plead since the outset of this case –

that Westinghouse and AMAG worked together to eliminate DOCA from the market.  See ECF No. 1 at ¶ 26; ECF No. 146, Ex. 1, at ¶¶ 51, 55, 64, 104.  While it is true, as Westinghouse contends, that conspiracy must be plead with specificity, we believe that DOCA has fulfilled its burden with its continual referral to Westinghouse's and AMAG's alleged plan to exclude DOCA from the market.  Consequently, inserting this phrase does not constitute a new legal theory and does not prejudice Westinghouse.

Even if adding "conspiracy to monopolize" constituted a new legal theory, which we do not believe it does, the relevant and essential discovery would exist internally within AMAG and Westinghouse.  Discovery on a third-party witness would be minimally useful in determining whether AMAG and Westinghouse conspired amongst themselves to monopolize the market.

### 2.  Delayed Filing of the Motion to Amend

While undue delay in filing a motion to amend a complaint can serve as a reason to deny the motion, the mere "passage of time, without more, does not require that a motion to amend a complaint be denied."  J.E. Mamiye & Sons, Inc. v. Fidelity Bank, 813 F.2d 610, 614 (3d Cir. 1987), citing Adams v. Gould Inc., 739 F.2d 858, 868 (3d Cir. 1984), cert denied, 469 U.S. 1122 (1985).  When analyzing an undue delay argument, the focus must be on plaintiff and his or her reason for failing to file the amended complaint earlier.  Id.

Westinghouse argues that DOCA became aware of its "Fraud on the NRC" theory of liability at least in March 2009, thus allegedly delaying the amendment by one year and five months.  Def.'s Br. Opp'n. 11.  Westinghouse notes that in early March, DOCA's attorney moved the court to allow four of its experts to gain access to Westinghouse's information shielded by the Protective Order.  Id.  Furthermore, Westinghouse notes that DOCA's attorney

explained that he had a "significant liability theory" that was "very, very, very important to the development of [DOCA's] case." Id. at 12, citing Ex. 4, at 11:4–11:5.

DOCA, however, denies having fully developed the "Fraud on the NRC" theory of liability in March of 2009. Pl.'s Reply Br. 4. Rather, DOCA claims that, pursuant to Rule 11, it could not have ethically sought to amend the Complaint because DOCA's counsel had no reasonable basis to assert that Westinghouse engaged in deliberate misconduct in its communications with the NRC. Id. at 4–5. In fact, DOCA notes that the transcript shows that DOCA's counsel needed to verify the theory's merit. Id. at 4, citing ECF No. 77 at 10–12.

We find no undue delay on the part of DOCA. The motion is timely because it was filed in compliance with our Order allowing amendments to be filed "on or before the close of discovery." Furthermore, DOCA's reason for filing on July 30, 2010 centers on a Rule 11 concern. DOCA's motive was to verify that it had a sound basis for its allegations before making them.

### 3. Prejudice in Discovery

Unlike an undue delay analysis which focuses on plaintiff, a prejudice analysis concentrates on the consequences faced by defendant as a result of the amended complaint. Adams, 739 F.2d at 868. Chief among these potential consequences are "additional discovery, cost, and preparation to defend against new facts or new theories." Cureton, 252 F.3d at 273.

Westinghouse claims that the delay in filing the motion to amend the Complaint severely prejudiced Westinghouse in the discovery process. Westinghouse argues that its witnesses were unprepared on the topic of communications with the NRC, depositions on utility deponents were incomplete in light of these new allegations, and additional witnesses would have needed to be deposed. Def.'s Br. Opp'n. 14–17. DOCA rejects Westinghouse's assertions and notes that if

either party became prejudiced during the discovery process it was DOCA due to the Westinghouse employees' "faded memories." Pl.'s Reply Br. 6. Finally, DOCA again claims that the subject of Westinghouse's submissions to the NRC have been a part of this case since the initial Complaint's allegations of Westinghouse's allegedly false statements to customers. Id.

In Coventry v. U.S. Steel Corp., the Third Circuit reversed the lower court's denial of plaintiff's leave to amend because no apparent prejudice existed. 856 F.2d 514, 518-19 (3d Cir. 1988). While recognizing that prejudice to defendant is grounds for denial, the Third Circuit found no prejudice since additional discovery was unnecessary. Id. at 519. The original complaint alleged an age retaliation claim against plaintiff, whereas the amended complaint sought to allege that defendant's policy of withholding certain severance benefits to retired employees violated the ADEA. Id. at 518–19. The court reasoned that additional discovery would most likely not be required, and that if any additional discovery proved necessary it would not be so burdensome as to prejudice the defendant. Id. at 19. Supporting its conclusion, the court stated, "[the validity of Defendant's policy denying severance benefits] permeates [Plaintiff's] claim of retaliation, and the presence of that claim indicates that [Defendant] would not have been unduly prejudiced if it had been required to respond to [Plaintiff's] amended complaint." Id. Therefore, the court concluded that any additional discovery would relate to the previous claim for which discovery had already occurred. Id.

We find that the present case is similar to Coventry. Based on the facts of this case, we do not believe that Westinghouse will be prejudiced in the discovery process if the Amended Complaint is allowed. First, discovery has already been extended multiple times. Consequently, Westinghouse has had ample opportunity to conduct the necessary discovery. Still, we do not imagine that Westinghouse would need to engage in any significant additional discovery. As

stated above, the "Fraud on NRC" theory of liability derives from the "Fraud on Customers" theory. Additionally, in order to defend against the initial theory of liability, "Fraud on Customers," Westinghouse would inherently be required to make virtually the same arguments and engage in very similar discovery that would be required to defend against "Fraud on the NRC." Therefore, like Coventry, the theory of liability alleged in the Amended Complaint "permeates" the theory of liability alleged in the original Complaint. For these reasons, we find no prejudice to Westinghouse.

Westinghouse also argues that it will suffer prejudice as a result of DOCA's proposed correction to define the relevant product market as "**the MUR uprate Market**" instead of the "high accuracy UFM nuclear power generating market." Def.'s Br. Opp'n. to Pl.'s Mot. to Substitute Proposed Am. Compl. 4. Westinghouse argues that the definition of the market as the "high accuracy UFM nuclear power generating market" is broad and encompasses the newly defined market, the "MUR uprate Market." Id. at 3–4. DOCA agrees that the "MUR uprate Market" is a part of the broader "high accuracy UFM nuclear power generating market." Pl.'s Reply to Def.'s Br. Opp'n. to Pl.'s Mot. to Substitute Proposed Am. Compl. 4. However, DOCA contends that the new definition merely clarifies the relevant market and does not prejudice Westinghouse. Id. at 6.

We agree with DOCA. Changing the defined relevant market from the "high accuracy UFM nuclear power generating market" to the "MUR uprate Market" does not prejudice Westinghouse. Because DOCA is seeking to substitute a narrower definition in place of a broader definition, Westinghouse will not be unfairly disadvantaged. The relevant discovery should have already been conducted because the original market definition requires discovery of the corrected market definition. In fact, Westinghouse's defenses in response to the originally

defined market will automatically be included in this narrowed market. If DOCA was proposing a broader market definition, then Westinghouse might have needed to engage in additional discovery and might have been prejudiced. However, since DOCA's redefinition of the market is refined and limited, Westinghouse will not be prejudiced.

**B. Futility of the Proposed Amended Complaint**

In addition to undue delay and prejudice to defendant, a court may also deny leave to amend if the complaint is found to be futile. Lake v. Arnold, 232 F.3d 360, 373 (3d Cir. 2000), citing Foman, 371 U.S. at 182. The Third Circuit has explained that a complaint is futile when it has failed to state a claim. In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997), citing Glassman v. Computervision Corp., 90 F.3d 617, 623 (1st Cir. 1996). In fact, in a futility analysis, the Third Circuit applies the same standard used to evaluate a 12(b)(6) motion to dismiss. Id. A 12(b)(6) motion to dismiss will not be granted unless the complaint, with all well-plead allegations taken as true and seen in the light most favorable to plaintiff, fails to state both a cognizable claim and the legal theory asserted. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). A 12(b)(6) motion will be denied if plaintiff's complaint does more than merely speculate and actually demonstrates credible grounds for the  relief desired. Id. at 555–56. In assessing a 12(b)(6) motion, the court is not concerned with "whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." In re Burlington, 114 F.3d at 1420 (citation and quotation omitted).

Westinghouse claims that DOCA's Amended Complaint is futile for the following three reasons: (1) the claims are not cognizable under any credible legal theory since the state law claims are impliedly preempted by NRC authority; (2) DOCA's choice of law erroneously asks this Court to apply Connecticut law over Pennsylvania law; and (3) the Lanham Act, Sherman

Antitrust Act, and state law claims are barred as a result of the NRC's primary jurisdiction. *See* Def.'s Br. Opp'n. 18–44.

In response, DOCA asserts that its state law claims are not preempted because the NRC regulatory scheme calls for a "federal-state" partnership. Pl.'s Br. in Reply 6–10. DOCA also argues that Connecticut law is proper because the misrepresentations were made by a business located in Connecticut, the alleged inappropriate conduct occurred in Connecticut, and a choice of law analysis reveals a false conflict in which Connecticut law applies. Id. at 26–29, 31–33. Finally, DOCA disputes the claim that the NRC has primary jurisdiction over the present matter. Id. at 14–26.

### 1. Preemption of the State Law Claims

Westinghouse first argues that the state law claims would not survive a 12(b)(6) motion to dismiss because Supreme Court case law suggests that state law tort claims involving fraud on a federal regulatory agency, such as the NRC, are impliedly preempted. Def.'s Br. Opp'n. 19. To support its contention, Westinghouse relies on Buckman Co. v. Plaintiff's Legal Committee, 531 U.S. 341 (2000), where the Court found that plaintiffs' state tort law actions were preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Medical Device Amendments of 1976 ("MDA"), because the allegations concerned defendant's misrepresentations to the FDA. Def.'s Br. Opp'n. 19.

In Buckman, the plaintiffs were patients who claimed "injuries resulting from the use of orthopedic bone screws [implanted] in the pedicles of their spines." Buckman, 531 U.S. at 343. The plaintiffs sued the consulting company that assisted the manufacturer of the screws as it sought federal regulatory approval for the screws. Id. The plaintiffs alleged that the consulting company engaged in fraudulent communications with the FDA in the course of gaining approval

to market the screws.  Id.  The plaintiffs sought relief pursuant to state tort law alleging that the

fraudulent communications were a "but for" cause of plaintiffs' injuries.  Id.  The Supreme Court

stated plaintiffs' claims as:  "Had the representations not been made, the FDA would not have

approved the devices, and plaintiffs would not have been injured."  Buckman, 531 U.S. at 343.

The bone screws were considered a Class III medical device under the MDA as a device

that presented a "potential unreasonable risk of illness or injury" and therefore was subject to the

FDA's strictest regulations before approval could be obtained.  Id.  at 344.  However, an

exception exists for devices that were already on the market prior to the enactment of the MDA.

Id. at 345.  "The MDA allows these 'predicate' devices to remain available until the FDA

initiates and completes the [premarket approval] process."  Id., citing 21 U.S.C. § 360e(b)(1)(A).

Because a predicate device manufacturer could potentially monopolize a market, "the MDA

allows other manufacturers to distribute (also pending completion of the predicate device's

[premarket approval]) devices that are shown to be "substantially equivalent" to a predicate

device, pursuant to the § 510(k) process.  Id., citing 21 U.S.C. § 360e(b)(1)(B).  To comply with

the §501(k) process, applicants must make a variety of disclosures, including "'a statement that

the submitter believes, to the best of his or her knowledge, that all data and information

submitted in the premarket notification are truthful and accurate and that no material fact has

been omitted,' § 807.87(k)."  Id.

The Buckman Court held that plaintiffs' state law claim was impliedly preempted

because it conflicted with the federal regulatory scheme.  Id. 348.  During the approval process

the FDA is empowered with "various provisions aimed at detecting, deterring, and punishing

false statements."  Id. at 349.  If the FDA suspects fraud "it may respond by seeking injunctive

relief, 21 U.S.C. § 332, and civil penalties, 21 U.S.C. § 333(f)(1)(A); seizing the device, §

334(a)(2)(D); and pursuing criminal prosecutions, § 333(a)." Id. This "flexible" array of options

is available in order to allow the FDA to address the competing objectives of ensuring "that

medical devices are reasonably safe and effective" and that § 510(k) devices are "on the market

within a relatively short period of time." Id. at 349–50. The Supreme Court also noted that "the

FDA is charged with the difficult task of regulating the marketing and distribution of medical

devices without intruding upon decisions statutorily committed to the discretion of health care

professionals." Id. at 350.

The Supreme Court explained the conflict as follows:

> State-law fraud-on-the-FDA claims inevitably conflict with the FDA's responsibility to police fraud consistently with the Administration's judgment and objectives. As a practical matter, complying with the FDA's detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants-burdens not contemplated by Congress in enacting the FDCA and the MDA. Would-be applicants may be discouraged from seeking § 510(k) approval of devices with potentially beneficial off-label uses for fear that such use might expose the manufacturer or its associates (such as petitioner) to unpredictable civil liability. In effect, then, fraud-on-the-FDA claims could cause the Administration's reporting requirements to deter off-label use despite the fact that the FDCA expressly disclaims any intent to directly regulate the practice of medicine, *see* 21 U.S.C. § 396 (1994 ed., Supp. V), and even though off-label use is generally accepted.

> Conversely, fraud-on-the-FDA claims would also cause applicants to fear that their disclosures to the FDA, although deemed appropriate by the Administration, will later be judged insufficient in state court. Applicants would then have an incentive to submit a deluge of information that the Administration neither wants nor needs, resulting in additional burdens on the FDA's evaluation of an application. As a result, the comparatively speedy § 510(k) process could encounter delays, which would, in turn, impede competition among predicate devices and delay health care professionals' ability to prescribe appropriate off-label uses.

Id. at 350-51 (footnote omitted). The Supreme Court also noted that the plaintiffs' "fraud-on-

the-agency claims . . . would not be relying on traditional state tort law," but on "federal

enactments" the existence of which "is a critical element in their case." Id. at 353. *See also*

Desiano v. Warner –Lambert & Co., 467 F.3d 85, 95-96 & n.8 (2d Cir. 2006) (quoting Oral

Argument Transcript from Buckman in which defense counsel noted that Buckman plaintiffs did

not allege that the bone screws themselves were defective or that there was a manufacturing or

design defect; nor did plaintiffs allege failure to warn or that any medical personnel were

negligent or committed malpractice).

Westinghouse argues that the present case is indistinguishable from Buckman, and thus

DOCA's state law claims are similarly preempted by the NRC regulatory scheme in so far as

those state law claims rely on misrepresentations made to the NRC. Def. Br. in Opp'n. 20–24.

Furthermore, Westinghouse argues that DOCA's state law claims conflict with the NRC's

regulatory scheme for the same reasons that the Supreme Court found that the state law claims in

Buckman conflicted with the FDA scheme. Def. Br. in Opp'n. 23–24.

As an initial matter we note that in Buckman the Supreme Court was concerned with the

plaintiffs' state law claim conflicting with the complicated, multi-layered regulatory scheme

under the FDA and MDA, in which the FDA is charged with balancing difficult and competing

objectives. There is no similar concern regarding the NRC. Westinghouse's argument that this

case is squarely within Buckman appears to be no more than taking the Supreme Court's

reasoning and substituting the NRC wherever the Supreme Court referred to the FDA without

providing a meaningful analysis of the differences between the FDA and NRC's regulatory

schemes. In fact the regulatory schemes are different.

In contrast to the FDA, the NRC's regulatory scheme consists of a federal-state

partnership. Pacific Gas & Elec. Co. v. State Energy Res. Cons. & Dev. Comm'n, 461 U.S. 190,

211–12 (1983). In Pacific Gas, the State of California sought to supplement the NRC

regulations by dictating where spent nuclear fuel could be stored. Showing that the NRC's

regulatory regime was not entirely comprehensive, the Supreme Court held that it was not

intended to preempt state law, stating as follows:

> The Federal Government maintains complete control of the safety and "nuclear"
> aspects of energy generation; the States exercise their traditional authority over
> the need for additional generating capacity, the type of generating facilities to be
> licensed, land use, ratemaking, and the like.

Id. at 212.  Unlike the comprehensive FDA regulatory scheme, which functions independently of

any state partnership, the NRC's authority is not exclusive.  Nor does the NRC regulatory

scheme preempt all state tort claims.  In Silkwood v. Kerr-McGee Corp., the Supreme Court

found that the NRC regulations dealing with nuclear safety were not so expansive as to preempt

a state tort claim concerning nuclear safety.  464 U.S. 238 (1984).  The Court explained as

follows:

> No doubt there is tension between the conclusion that safety regulation is
> the exclusive concern of the federal law and the conclusion that a State
> may nevertheless award damages based on its own law of liability.  But as
> we understand what was done over the years in the legislation concerning
> nuclear energy, Congress intended to stand by both concepts and to
> tolerate whatever tension there was between them.

Id. at 256.

We are unable to conclude that there is a conflict here that would impliedly preempt

DOCA's state law claims.  We see no conflict that would cause the state claims here to upset or

interfere with a "delicate balance of statutory objectives" of the NRC similar to how the Supreme

Court found the state claim in Buckman would interfere with the FDA's statutory scheme.

Buckman, 531 U.S. at 348.  In addition, other courts have permitted state claims to proceed

where there are allegations that a defendant violated NRC regulations.  Pierce v. Commw.

Edison, 112 F.3d 893 (7th Cir. 1997).  See also Conway v. PECO Energy Co., 1997 WL 34672

(E.D. Pa. 1997) (tort for interference with contractual relations is the protection of contractual

relationships from unreasonable interference by third parties, the vindication of which has nothing whatsoever to do with nuclear power plant safety despite allegation that defendant failed to comply with NRC regulation).

DOCA's state law claims are also not similar to the plaintiffs' state claims in <u>Buckman</u>, as the <u>Buckman</u> plaintiffs' claim was a straightforward allegation that the defendant's fraud on the FDA caused their injuries with no reliance on any traditional state tort law such as defect, failure to warn, or negligence.  <u>Desiano</u>, 467 F.3d at 95-96 & n.8.  In contrast, DOCA asserts a state law unfair competition claim and an interference with prospective economic damage claim that have *as a part of the claims* the allegation that Westinghouse engaged in deliberate misconduct before the NRC.  Thus, DOCA will attempt to use evidence of deliberate misconduct to prove that Westinghouse breached its duty under state law in order to establish that the elements of the state law claims have been met.  *See* <u>Desiano</u>, 467 F.3d at 95 ("<u>Buckman</u> cannot be read as precluding [] preexisting common law liability based on other wrongs, even when such liability survives only because there was also evidence of fraud against the FDA"); <u>Yocham v. Novartis Pharmaceutical Co.</u>,  736 F.Supp.2d 875, 889 (D.N.J. 2010) ("fraud-on-the-FDA as an added element of a traditional tort claim does not substantially alter the incentives companies have in engaging in the reporting process, [thus] there is no interference with the federal scheme sufficient to overcome the presumption against preemption.")   Thus, we conclude that DOCA's state law claims are not impliedly preempted by the NRC regulatory scheme.

## 2.  Choice of Law

Next, Westinghouse argues that DOCA's Amended Complaint would not survive a 12(b)(6) Motion to Dismiss because DOCA asks this Court to apply Connecticut law instead of Pennsylvania law.  Def. Br. in Opp'n. 29.  Federal district courts are to apply the forum state's

choice of law analysis to state law issues.  Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941); Waggaman v. General Finance Co. of Philadelphia, 116 F.2d 254, 257 (3d Cir. 1940).  Consequently, Pennsylvania's conflict of law analysis will be used.

In Hammersmith v. TIG Ins. Co., the Third Circuit clarified how the federal district courts should apply Pennsylvania's choice of law rules.  480 F.3d  220 (3d Cir. 2007).  There, the court instructed that the court must first determine whether there is an actual difference between the two states' laws.  Id. at 230.  If the two laws are the same, then further analysis is unnecessary.  Id.  On the other hand, if a conflict in laws exists, then the second step requires the court to classify the conflict as "true," "false," or "unprovided-for."  Id.

A "true" conflict exists if the application of either jurisdiction's law would harm the other jurisdiction's interests.  Id.  In this type of case, the court would then perform a balancing test to decide "which state has the 'greater interest in the application of its law.'" Id. at 231, citing Cipolla v. Shaposka, 267 A.2d 854, 856 (Pa. 1970).  In order to perform this balancing test, the court considers each state's contacts and interests on both a quantitative and qualitative scale.  Id. As the Third Circuit noted, "we must weigh the contacts on a qualitative scale according to their relation to the policies and interests underlying the [particular] issue."  Hammersmith, 480 F.3d at 231, citing Shields v. Consol. Rail Corp., 810 F.2d 397, 400 (3d Cir. 1987).

A "false" conflict occurs when "only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's laws."  Hammersmith, 480 F.3d at 229, citing Lacey v. Cessna Aircraft Co., 932 F.2d 170, 187 (3d Cir. 1991).  In this situation, the laws of the harmed state will be applied.  Hammersmith, 480 F.3d at 230.

The final type of conflict, an "unprovided-for" conflict, exists when neither state's interests are harmed by the application of the other state's law; as a result, the courts will apply

the law of the state where the tort was committed. Hammersmith, 480 F.3d at 230 n. 9, citing Garcia v. Plaza Oldsmobile Ltd., 421 F.3d 216, 220 (3d Cir. 2005).

The applicable Connecticut state law alleged by DOCA provides for a private right of action to "any person who suffers any ascertainable loss" against someone who "engage[s] in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b & g. Westinghouse submits that the applicable Pennsylvania law that should apply in this case provides for a private action when the person "purchases or leases goods or services primarily for personal, family, or household purposes and thereby suffers any ascertainable loss." 73 P.S. § 201-9.2.

Westinghouse claims that a false conflict exists between the Pennsylvania law and the Connecticut law because only Pennsylvania's interests would be harmed by the application of Connecticut's laws. Def.'s Br. Opp'n. 37. In support of its argument, Westinghouse asserts that Pennsylvania purposefully limited the private right of action to consumers of goods used for household purposes and excluded a broad private right of action similar to Connecticut's in order to ensure that consumers were adequately protected without unnecessarily hurting businesses. Id. at 35–36.

DOCA also classifies this issue as a false conflict; however, DOCA argues that only Connecticut's interests would be impaired by the application of Pennsylvania's law. Pl.'s Reply Br. 26–29. DOCA argues that Connecticut's interest in discouraging all unfair business practices occurring within its borders will be harmed if the more narrow Pennsylvania law is applied. Id. at 27. DOCA further claims that Pennsylvania's lack of a broader private action only indicates "a lack of any perceived need for state legislation" in that field, and that there is no identifiable Pennsylvania interest that would be harmed. Id. at 27–28.

We believe that this issue presents a false conflict in which only Connecticut's interests would be harmed if Pennsylvania law is applied. Westinghouse has not provided evidence showing that the Pennsylvania legislature expressly and purposefully omitted a broad private right of action similar to Connecticut's in order to protect some other interests. As DOCA persuasively argues, "just because Pennsylvania did not pass a state RICO act [does not mean that] Pennsylvania expressed a state interest in protecting racketeering enterprises headquartered in Pennsylvania from private treble damage suits." Pl.'s Reply Br. 27–28. In fact, Westinghouse concedes that Pennsylvania's alleged interest is merely "inherent in the UTPCPL." Def.'s Br. Opp'n. 36.

Not only is Pennsylvania's alleged interest unarticulated, but Connecticut's identified interests will be harmed if Pennsylvania law is applied. Connecticut has expressed an interest in protecting its citizens and deterring unfair competition and unfair business practices by entities located in Connecticut. During the relevant times, Westinghouse and its predecessors conducted business out of offices in Windsor, Connecticut. Moreover, the business conducted out of the Connecticut offices is significant for two reasons: (1) the business concerned the CROSSFLOW product; and (2) the Topical Report was created and produced there. We therefore conclude that if Pennsylvania law is applied, thereby effectively eliminating DOCA's state law claims, then Connecticut's interest in discouraging unfair business practices from occurring in its state will be severely injured.

### 3. Primary Jurisdiction of the NRC

Finally, Westinghouse argues that DOCA's Amended Complaint is futile because the Lanham Act, Sherman Antitrust Act, and Connecticut state law claims are barred under the theory of primary jurisdiction. Def. Br. in Opp'n. 24. Primary jurisdiction "'is concerned with

promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.'" Nader v. Allegheny Airlines, Inc., 426 U.S. 290, 303 (1976), quoting United States v. Western Pacific R. Co., 352 U.S. 59, 63 (1956). According to the Third Circuit, a court should defer an issue to the agency when the "'subject matter is within an agency's jurisdiction and where it is a complex matter requiring special competence, with which the judge or jury would not or could not be familiar.'" MCI Telecommunications Corp. v. Teleconcepts, Inc., 71 F.3d 1086, 1104 (3d Cir. 1995), quoting Elkins v. Bell Tel. Co. of Pa., 420 A.2d 371, 377 (Pa. 1980). However, when the courts or jury are adequately able to decide the issue, "'the court *must* not abdicate its responsibility.'" Id., quoting Elkins, 420 A.2d at 377 (emphasis added).

Westinghouse previously requested, under the doctrine of primary jurisdiction, that the Court reserve issues regarding the technical aspects of the AMAG CROSSFLOW UFM for the NRC and subsequently dismiss DOCA's complaint. *See* Westinghouse's Br. in Support of Mot. to Dismiss 19–26. However, this Court rejected Westinghouse's primary jurisdiction argument noting that no technical issues exist. Caldon, Inc. v. Advanced Measurement & Analysis Group, Inc., 515 F.Supp.2d 565, 573 (W.D.Pa. 2007). Instead, we found that the relevant issue is "whether, prior to and during this process, the Defendants ha[d] misrepresented the accuracy of their UFM and disparaged Plaintiff's device so as to violate the Lanham and Sherman Acts," a question undoubtedly within this Court's competence. Id. at 573–74.

Westinghouse claims that its present primary jurisdiction argument is different; namely, that the NRC has "exclusive jurisdiction to hear claims in the first instance that allege, as a basis of liability, fraud on the NRC." Def. Br. Opp'n. 25–26  n. 10. Westinghouse further argues that because Congress did not provide a private cause of action under §50.5 the NRC has exclusive

authority to police fraud. Westinghouse also points out that the NRC now has a copy of the Talisman Report and may conduct its own investigation pursuant to §50.5.

Westinghouse's argument is flawed for two reasons. First, regardless of Westinghouse's distinction between the two primary jurisdiction arguments, our previous Opinion clearly stated that fraud – what Westinghouse bases its current primary jurisdiction argument on – is unquestionably within the competence of this court. <u>Caldon</u>, 515 F. Supp. 2d at 573–74. Second, it is irrelevant that §50.5 fails to provide a private cause of action. DOCA is not seeking damages under §50.5; instead, DOCA is pointing to §50.5 to further its claims. Finally, both the NRC and this Court may make determinations regarding Westinghouse's alleged conduct without adversely affecting each other's decisions. As we noted in our previous opinion denying Westinghouse's Motion to Dismiss (ECF No. 23), "[t]he NRC's conclusions may well affect Defendant's defense against DOCA's claims … but this does not affect our competence to consider Plaintiff's claims." <u>Caldon</u>, 515 F. Supp.2d at 574.

### C. Striking Allegations of "Deliberate Misconduct" and Fraud on the NRC

Because we conclude that DOCA is permitted to file its Amended Complaint, we address Westinghouse's argument that DOCA's allegations of "deliberate misconduct" and fraud on the NRC should be stricken from the Amended Complaint before it is filed. Def. Br. Opp'n. 44.

Pursuant to Rule 12(f), a court may strike any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. Fed. R. Civ. P. 12(f). This Court previously articulated the relevant standard:

> While a court possesses considerable discretion in disposing of a motion to strike under Rule 12(f), such motions are not favored and usually will be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties.

<u>Lance Thornton v. UL Enterprises, LLC</u>, 2010 WL 1004998, at *1 (W.D.Pa. March 16, 2010) (citations and quotations omitted).

Westinghouse argues that the allegations of "deliberate misconduct" are immaterial, impertinent, and scandalous only because DOCA wants to "inflame the jury by painting Westinghouse and AMAG as fraudsters willing to do anything to sell the AMAG CROSSFLOW UFM." Def. Br. Opp'n. 46. DOCA, however, notes that these claims are merely allegations of fraud, which are relevant and essential to its claims. Pl. Br. in Reply 34–35.

We agree with DOCA. The allegations of "deliberate misconduct" and fraud are relevant to DOCA's claims and are not scandalous. Moreover, they are included as evidence of the claims against Westinghouse. The validity of those claims is for the trier of fact to decide.

### D. DOCA's Corrected Replies to Counterclaims

Finally, we address DOCA's request under Rule 15(a)(2) that it be permitted to correct its replies to Westinghouse's counterclaims. Specifically, DOCA wishes to deny five allegations (¶¶ 26, 27, 28, 29, & 30) and revoke its admission of six allegations (¶¶ 25, 26, 27, 28, 29, & 30). DOCA's proposed corrected replies to Westinghouse's counterclaims are mere typographical errors that do not affect the overall theory or nature of the case. Furthermore, the corrections are undisputed. Consequently, the corrected replies to Westinghouse's counterclaims will be allowed.

### IV.  Conclusion

We conclude that DOCA's Motion for Leave to File an Amended Complaint is timely, is not futile, and does not prejudice Westinghouse. Accordingly, we will grant DOCA's Motion.

# ORDER

AND NOW, to-wit, this ___9th___ day of ___August___, 2011, it is hereby ORDERED, ADJUDGED, and DECREED that Plaintiff's Motion for Leave to File an Amended Complaint and Corrected Replies to Counterclaims (ECF No. 146) be and hereby is GRANTED.

Plaintiff shall file a "clean" copy of its "Corrected Amended Complaint" with the word "Corrected" removed from the title, no later than seven days from the date this Order is entered on the docket. The newly-filed Amended Complaint will be deemed to relate back to December 29, 2004, the date the original Complaint was filed, pursuant to Federal Rule of Civil Procedure 15(c)(1)(B). Defendants shall file any responsive pleading to the Amended Complaint no later than twenty-one days after the Amended Complaint is filed.

IT IS FURTHER ORDERED that Plaintiff shall file its "Corrected Replies to Defendants' Counterclaims" no later than seven days from the date this Order is entered on the docket.

Maurice B. Cohill, Jr.,
Senior United States District Court Judge