IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DOCA COMPANY, as successor to
Caldon Company Limited Partnership,

      Plaintiff and Counterclaim Defendant,

v.

WESTINGHOUSE ELECTRIC COMPANY
LLC, and ADVANCED MEASUREMENT &
ANALYSIS GROUP, INC.

      Defendants and Counterclaim Plaintiffs.

Civil Action No. 04-1951

HON. MAURICE B. COHILL, JR.

HON. LISA PUPO LENIHAN

Filed Electronically

**<u>PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT ON NOERR-PENNINGTON GROUNDS</u>**

Anthony P. Picadio, Esquire
Pa. I.D. No. 01342
Jason A. Spak, Esquire
Pa. I.D. No. 89077

PICADIO SNEATH MILLER & NORTON, P.C.
Four Gateway Center
444 Liberty Avenue, Suite 1105
Pittsburgh, PA 15222
(412) 288-4000
*Attorneys for Plaintiff*

### TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ i

SUMMARY OF ARGUMENT ........................................................................... 1

ARGUMENT ..................................................................................................... 3

1.     *Noerr-Pennington* does not apply in the non-political, non-policy-making arena in which the approval of the CROSSFLOW Topical Report occurred ............................................................................. 3

        a.     Case law applying the *Noerr-Pennington* doctrine distinguishes between protected political activity regarding public policy and unprotected non-political activity .................................. 3

        b.     The governmental function here did not involve political activity or public policy ............................................................ 7

        c.     Westinghouse's activity here is not political speech .................................. 8

2.     *Noerr-Pennington* does not apply because the restraint in question was not imposed by government action but rather by private action ................... 11

3.     Since the First Amendment right to petition does not cover petitions based on known falsehoods, *Noerr-Pennington* does not apply in the first instance .......................................................... 14

4.     If squarely presented with this case, the Third Circuit would hold either that *Noerr-Pennington* does not apply to known falsehoods, or that they are excepted from the application of *Noerr-Pennington* ................... 20

        a.     The *Cheminor* decision is factually distinguishable, and its language actually supports Caldon's position here ................................. 22

             i.     *Cheminor*'s holding is distinguishable ........................................... 22

             ii.     *Cheminor*'s dicta supports Caldon's position ................................ 22

        b.     The *Armstrong* decision is factually distinguishable, and its language actually supports Caldon's position here ................................. 25

c.    The Third Circuit's most recent statement on the *Noerr-Pennington* doctrine reiterates that deception to an entity other than the legislature can be grounds for antitrust liability ...................................................................................26

5.   Even if the Court adopts Westinghouse's restrictive view of the exceptions to *Noerr-Pennington* immunity, the *Walker Process* exception applies because the NRC proceedings at issue were effectively *ex parte* ..................................................................28

CONCLUSION.............................................................................................................29

## TABLE OF AUTHORITIES

Page

**Case Law – United States Supreme Court**

*Allied Tube & Conduit Co. v. Indian Head*, 486 U.S. 492 (1988).........................................*passim*

*California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) ...........16, 17, 18, 27

*City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365 (1991)....................................25, 26

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961)..............................................................................................................2, 10

*FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990)................................................16

*Parker v. Brown*, 317 U.S. 341 (1943) .........................................................................................26

*Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993)................................................................................................................*passim*

*United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965) .......................................11

*Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*,
382 U.S. 172 (1965)...............................................................................................................*passim*

**Case Law – Other Courts**

*Armstrong Surgical Ctr. Inc. v. Armstrong County Memorial Hospital*,
185 F.3d 154 (3d Cir. 1999)..................................................................................................*passim*

*Borough of Lansdale v. PP & L, Inc.*, 426 F. Supp. 2d 264 (E.D. Pa. 2006) ................................10

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297 (3d Cir. 2007) ...................................3, 7, 26, 27

*Caldon, Inc. v. Advanced Measurement & Analysis Group, Inc.*,
515 F. Supp. 2d 565 (W.D. Pa. 2007).........................................................................................2

*Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119 (3d Cir. 1999).....................................*passim*

*County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1387 (E.D.N.Y. 1989) ...................10

*George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25 (1st Cir. 1970)......5, 6, 7

*In re Circuit Breaker Litig.*, 984 F. Supp. 1267 (C.D. Cal. 1997)..................................................10

i

*In the Matter of Union Oil Company of California* ("*Unocal*"),
138 FTC 1 (July 7, 2004) ................................................................................................19, 21, 27

*Israel v. Baxter Laboratories, Inc.*, 466 F.2d 272 (D.C. Cir. 1972) .........................................19, 27

*Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*,
401 F.3d 123 (3d Cir. 2005)............................................................................................27

*Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1993)..............................................6, 7, 9

*United States v. Stewart*, 323 F. Supp. 2d 606 (S.D.N.Y. 2004) ....................................15

*Whelan v. Abell*, 48 F.3d 1247 (D.C. Cir. 1995)......................................................2, 20, 24, 27

*Woods Explor. & Prod. Co. v. Aluminum Co. of Am.*, 36 F.R.D. 107
(S.D. Tex. 1963), *aff'd in pert. part*, 438 F.2d 1286 (5th Cir. 1971)........................6, 7, 9

## Statutes, Regulations and Court Rules

10 C.F.R. § 50.5 ...............................................................................................................15

18 U.S.C. § 1001 ..........................................................................................................2, 15, 24

Fed. R. Civ. P. 5.1 ...........................................................................................................15

Lanham Act.......................................................................................................................27

Sherman Act, § 2..........................................................................................................2, 24

**PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS[1] FOR PARTIAL SUMMARY JUDGMENT ON NOERR-PENNINGTON GROUNDS**

Defendants' Motion for Partial Summary Judgment invokes the *Noerr-Pennington* doctrine and asks the Court to grant "partial summary judgment on all of Caldon's claims to the extent they allege or are premised on … communications with the NRC …." ECF No. 303 ("Brief") at p. 5. For the reasons hereinafter set forth, that Motion must be denied.

## SUMMARY OF ARGUMENT

The *Noerr-Pennington* doctrine does not apply to immunize the Defendants' contacts with the NRC from antitrust liability for the following reasons:

1.    As Westinghouse correctly points out, the *Noerr-Pennington* doctrine is based on the First Amendment right to petition government for redress of grievances. Brief at p. 1. However, the First Amendment does not protect ***all*** communications with the government, as Westinghouse alleges. The First Amendment, as applied through the *Noerr-Pennington* doctrine, only protects those communications which are addressed to policy-makers and which are therefore political in nature. The governmental action at issue in this litigation did not involve policy making and had no political implications. Rather, it was a highly technical decision by government engineers to approve a specific product for subsequent use in MUR uprate applications. Communications about such a technical decision do not constitute petitioning government for redress within the meaning of the First Amendment. *Noerr-Pennington* therefore does not apply.

2.    *Noerr-Pennington* immunity applies in only those antitrust cases where the government, through regulation, imposes a restraint on trade or creates a monopoly. In the

---

[1] Westinghouse's motion for summary judgment has been joined by co-Defendant AMAG. ECF No. 320. Because Westinghouse's motion only describes conduct by Westinghouse and its predecessor ABB, this brief will refer to "Westinghouse" as opposed to "Defendants." Neither of Defendants' motions provides any facts to indicate that AMAG, on its own and independently of Westinghouse, submitted any petitions to the government that could provide AMAG with *Noerr-Pennington* immunity.

doctrine's seminal case, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), railroads asked the government to impose regulations that restrained truckers and thus benefitted railroads.   The Supreme Court held that "where restraint or monopolization is the result of valid governmental action, as opposed to private action, no violation of the [Sherman Act] can be made out." *Id.* at 136.

Here, as Westinghouse itself concedes, there was no such governmental restraint: the NRC's "regulatory review process ... was not capable of directly injuring Caldon's business relationships."  Brief at p. 21; *see also* ECF No. 304 ("WH Facts") at ¶¶ 19-21, 37.  The NRC's approval of the CROSSFLOW Topical Report opened the door for the Defendants to enter the MUR uprate market, but it was the Defendants' private action once they got through the door, in misrepresenting to customers the quality of their product, which excluded Caldon's product from the market.

Caldon was not harmed by the Topical Report itself; it was the subsequent private conduct of the Defendants in selling their product that caused the injury.  *Noerr-Pennington* therefore does not apply.  This Court previously rejected the Defendants' *Noerr-Pennington* argument on this ground. *Caldon, Inc. v. Advanced Measurement & Analysis Group, Inc.*, 515 F. Supp. 2d 565, 574 (W.D. Pa. 2007).

3.     The First Amendment petitioning clause does not protect a communication to a government agency that conceals material information or makes material misrepresentations. *See, e.g.*, 18 U.S.C. § 1001 (making materially false statements to federal departments or agencies is a federal crime).  If the Defendants' communications with the NRC featured material omissions or misrepresentations, as Caldon has alleged, then those communications are not protected by the First Amendment petitioning clause. *See Whelan v. Abell*, 48 F.3d 1247, 1254-55 (D.C. Cir. 1995) ("However broad the First Amendment right to petition may be, it cannot be

- 2 -

stretched to cover petitions based on known falsehoods"). This is not an exception to the application of *Noerr-Pennington*. Rather, it is a determination that the conduct is not protected by the First Amendment in the first instance and therefore *Noerr-Pennington* simply does not apply.

4.    If squarely presented with this issue, the Third Circuit Court of Appeals would join the great majority of other circuits and hold that *Noerr-Pennington* does not immunize falsehoods, either because they are not protected by the First Amendment in the first instance, or because they are excepted from the application of *Noerr-Pennington*.

5.    Under the "*ex parte* proceeding" exception recognized by the Third Circuit, Westinghouse's undisclosed, purportedly proprietary communications with the NRC are not protected by either the First Amendment or the *Noerr-Pennington* doctrine.

## ARGUMENT

1.    **<u>*Noerr-Pennington* does not apply in the non-political, non-policy-making arena in which the approval of the CROSSFLOW Topical Report occurred.</u>**

   a.    **<u>Case law applying the *Noerr-Pennington* doctrine distinguishes between protected political activity regarding public policy and unprotected non-political activity.</u>**

The Third Circuit's most recent description of the scope of the *Noerr-Pennington* doctrine is as follows:

> "In activities that enjoy *First Amendment* protection such as ***lobbying***, firms may enjoy broad immunity from antitrust liability for concerted efforts ***to influence political action*** in restraint of trade even when such efforts employ unethical or deceptive efforts. '[I]n ***less political arenas***,' however, such as here, 'unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations.'"

*Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007) (emphasis added).

The *Broadcom* court went on to point out that "Private standards-determining organizations, in contrast to *legislative or quasi-legislative bodies*, have historically been subject to antitrust scrutiny." *Id.* (emphasis added).

While not intended to be exhaustive, the *Broadcom* court's description of the kind of activity (lobbying), the purpose of the activity (to influence political action), and the targets of the activity (legislative or quasi-legislative bodies) encompassed by the First Amendment right to petition, places strong emphasis on the political nature of the activity and the policy-making nature of the governmental body in question. Other court decisions have done likewise.

In *Allied Tube & Conduit Co. v. Indian Head*, 486 U.S. 492 (1988), a company that manufactured metal conduit for electrical wires approached a private standards-setting body whose decisions were "widely adopted into law by state and local governments." *Id.* at 502. The metal conduit maker convinced the standards body not to approve plastic conduit by packing the standards body with voters who "were instructed where to sit and how and when to vote by group leaders who used walkie-talkies and hand signals to facilitate communication." *Id.* at 503.

When an electric conduit maker sued in antitrust, the metal conduit maker argued that the *Noerr-Pennington* doctrine immunized its conduct. The Supreme Court held otherwise, distinguishing between the kind of petitioning in *Noerr* and *Pennington* and the kind of petitioning in which the defendant-petitioner had engaged:

> The validity of … efforts [to influence governmental action], and thus the applicability of *Noerr* immunity, varies with the context and nature of the activity. A publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods. But in *less political arenas*, unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations.

*Id.* at 499-500 (emphases added) (citations omitted).

The *Allied Tube* Court stated that the petitioning in *Noerr* was protected from the antitrust laws because it was "a classic attempt … ***to influence legislation*** by a campaign of publicity" whose "essential character … was … ***political***, and could not be segregated from the activity's impact on business." *Id*. at 505 (emphasis added).   In contrast to *Noerr*, the petitioning in *Allied Tube* was unprotected because "Unlike the publicity campaign in *Noerr*, the activity at issue here did not take place in the open ***political arena***, where partisanship is the hallmark of decisionmaking, but within the confines of a private standard-setting process."   *Id*. at 506 (emphasis added).

In *George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 424 F.2d 25 (1st Cir. 1970), the plaintiff alleged that whenever a municipality decided to build a public pool, defendant Paddock would present draft standards to the municipality and its architect without telling them that the standards essentially required the municipality to use Paddock's products. When Whitten, a competitor, sued in antitrust, Paddock claimed that its communications with the school boards and architects enjoyed *Noerr-Pennington* immunity.   The First Circuit disagreed and reversed the district court, which had entered summary judgment in Paddock's favor.   The First Circuit thought the case presented "the question of whether a particular attempt to influence a public official is the kind of political activity which *Noerr* protects."   *Id*. at 33.   It answered that question in the negative on the facts before it:

> The key to [*Noerr*], in our opinion, is the Court's heavy emphasis on the ***political nature*** of the railroad's activities and its repeated reference to the "passage or enforcement of laws." The entire thrust of *Noerr* is aimed at insuring uninhibited access to government ***policy makers***. A pluralistic society moves by many motives. The hope, supported by history, is that permitting every interest to be heard will produce a tolerable amalgam responsive to the needs of a given time. But the efforts of an industry leader to impose his product specifications by guile, falsity, and threats on a harried architect hired by a local school board hardly rise to the dignity of an effort to influence the passage or enforcement of laws. By "enforcement of laws" we understand some significant policy determination in the application of a statute, ***not a technical decision*** about the best kind of weld to use in a swimming pool gutter.

- 5 -

*Whitten*, 424 F.2d at 32 (emphasis added).

The Fifth Circuit followed *Whitten* in *Woods Explor. & Prod. Co. v. Aluminum Co. of Am.*, 36 F.R.D. 107 (S.D. Tex. 1963), *aff'd in pert. part*, 438 F.2d 1286 (5th Cir. 1971).   In *Woods*, the plaintiff owned 10%, and the defendants owned 90%, of a Texas field from which the parties extracted natural gas.   The Texas railroad commission required all parties to submit monthly forecasts regarding how much gas they could sell, and it set extraction limits based on those forecasts.   The plaintiff alleged that the defendants filed false low forecasts, which caused the commission to set low monthly limits, which benefitted defendants because their wells could not extract as much gas as plaintiff's wells could.

The plaintiff won a trial judgment, but the district court granted *j.n.o.v.*   The Fifth Circuit reversed, but it approved the district court's decision that the *Noerr-Pennington* doctrine did not immunize defendants against antitrust liability.   The district court had stated that:

> If the defendants were enjoined from conspiring to submit false nominations to the Railroad Commission would they be deprived of any Constitutional right to petition or participate in the Governmental process? The answer clearly seems to be that the defendants would only be prohibited from undertaking certain joint business behavior. To subject them to liability under the Sherman Act for conspiring to restrict production or to eliminate a competitor would effectuate the purposes of the Sherman Act and would not remotely infringe upon any of the constitutionally protected freedoms spoken of in *Noerr*.

36 F.R.D. at 111-12.

The Fifth Circuit agreed with that assessment, stating that:

> We therefore find *Noerr-Pennington* inapplicable to the alleged filing of false nominations by defendants because this conduct was not action designed to ***influence policy***, which is all the *Noerr-Pennington* rule seeks to protect.

438 F.2d at 1299 (emphasis added).

The Third Circuit reached a similar conclusion in *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1993).   In *Ticor*, the FTC sued "five of the nation's largest title insurance companies (collectively 'Ticor') [for] agreeing collectively to set uniform rates for title search

and examination services.   Ticor accomplished this rate setting through state-licensed 'rating bureaus' in thirteen states." *Id*. at 1130-31.   The Third Circuit described Ticor's argument for *Noerr-Pennington* immunity, and its decision to reject that argument, as follows:

> Ticor contends that its activities are a protected form of "joint petitioning" because it did not agree to charge proposed rates without approval from each state's insurance department. Ticor's argument is unavailing. The conduct which it refers to as "joint petitioning" of the government is in fact nothing more than action in a private marketplace. We agree with the FTC that Ticor's "collective rate setting efforts can 'more aptly be characterized as commercial activity with a political impact' . . . than as political activity with a commercial impact."

*Id*. at 1138 (citations omitted).

### b.   The governmental function here did not involve political activity or public policy.

Here, the Defendants' activities (submission of a highly technical Topical Report relating to a specific product), and the governmental function involved (reviewing a technical report for safety implications of a product to be used by nuclear power plants), are very far removed from the type of political activities which *Broadcom, Allied Tube, Whitten*, *Woods*, and *Ticor* said enjoy First Amendment protection.   Therefore, the *Noerr-Pennington* doctrine does not apply to immunize the Defendants' communications to the NRC.

The CROSSFLOW Topical Report itself is a highly technical document, prepared by engineers involving a highly specialized product – an ultrasonic flow meter – having a highly specialized use – measurement of velocity of feedwater flow in a nuclear power plant.   *See* WH Facts at ¶¶ 14, 16 (stating that the Topical Report was solely a technical document).

The governmental officials that reviewed the report, were also engineers who applied their technical expertise and applicable scientific and engineering standards in determining whether or not to issue a Safety Evaluation Report ("SER") approving the product for use by nuclear power plants that were seeking to increase their power output by improving the accuracy of their feedwater flow measurements.

This process is too specific for broad policy making. The single question to be decided by the NRC personnel reviewing the Topical Report was whether the product, as described and presented in the Topical Report, meets the scientific and engineering standards employed by the reviewers.

Nor is there room in this process for political influence. The product passes or fails the review based entirely on the technical merits of the Topical Report. Therefore, this is clearly not a case where the Defendants' First Amendment right to petition government for redress of grievances is even remotely implicated.

In summary, Westinghouse's communications to the NRC are not "petitions for redress" seeking policy making actions that qualify for *Noerr-Pennington* immunity: they were, instead, technical requests for highly specific regulatory action, whose essential character was commercial, not political. Westinghouse was essentially asking for permission to sell the CROSSFLOW UFM to power plants for use in uprate applications. Westinghouse's motion for summary judgment on *Noerr-Pennington* grounds should be denied on these grounds.

c.   <u>**Westinghouse's activity here is not political speech.**</u>

On August 23, 1999, Westinghouse's predecessor submitted the CROSSFLOW Topical Report, which was written entirely by engineers (and which was reviewed entirely by engineers). This engineer to engineer communication was highly technical containing the various mathematical formulae and analyses purportedly supporting the claimed accuracy of the CROSSFLOW UFM. Additional submissions supporting the CROSSFLOW Topical Report were submitted in January, 2000, and were also highly technical documents prepared by engineers. *See generally* WH Facts at ¶¶ 17, 23-24.

After the Topical Report was approved by the NRC, and after overpower events occurred at Byron-Braidwood, Fort Calhoun, and later at Calvert Cliffs, Westinghouse and AMAG had

numerous contacts with the NRC in a four-year, ultimately unsuccessful effort, to defend the CROSSFLOW Topical Report.  See Caldon's Presentation of Relevant Evidence ("R.E.") at ¶ 24.  All of these contacts were highly technical in nature and were engineer to engineer.  As pointed out in the Talisman Report and the Addendum thereto (Exs. 19 and 20), this four-year effort was characterized by the withholding from the NRC of material information and had the effect of substantially delaying the ultimate decision of the NRC to withdraw its approval of the CROSSFLOW Topical Report.

Prior to 2000, the NRC had a formal policy which required nuclear power plants to operate 2% below maximum power, because there was a 2% uncertainty associated with the venturi nozzles that plants used to measure their feedwater flow (a proxy for power output).  ECF No. 263 (Amended Complaint) at ¶¶ 16-19.  Caldon successfully petitioned the NRC to adopt an "MUR Uprate Program," which allowed plants that used more accurate devices to measure their feedwater flow to operate at a higher power.  *Id.* at ¶¶ 21-22.  Caldon and Westinghouse both asked the NRC to find that their respective flow meters were more accurate than venturi nozzles and therefore eligible for the MUR Uprate Program.  Caldon received this approval in 1999; Westinghouse received it in 2000.  *Id.* at ¶¶ 24, 63.

These facts indicate that when each party asked the NRC to approve its meter for use under the MUR Uprate Program, it was making a technical request for approval under existing regulations (as in *Woods* and *Ticor*) and not a broad request for new public policy (as in *Noerr* and *Pennington*).  Because the parties merely sought NRC approval as a way to make their devices more attractive to customers, the "essential character" of their activities "can more aptly be characterized as commercial activity with a [very tenuous if any] political impact."  *Allied Tube*, 486 U.S. at 508, 510.

- 9 -

Westinghouse cites three cases, with no analysis, in an attempt to show that communications with regulatory bodies like the NRC are "petitions for redress" within the context of the *Noerr-Pennington* doctrine. But all three of these cases involved requests for high-level policies, as opposed to approvals of technical issues:

*In re Circuit Breaker Litig.*, 984 F. Supp. 1267 (C.D. Cal. 1997), cited in Brief at 11, was a case like *Noerr*, in which makers of new case circuit breakers asked the NRC to impose new regulations to govern their rivals, refurbishers and re-sellers of old case circuit breakers, on the grounds that the old breakers were not safe and were misleading to customers. *Id.* at 1275.

*County of Suffolk v. Long Island Lighting Co.*, 710 F. Supp. 1387 (E.D.N.Y. 1989), cited in Brief at 11, was not an antitrust action and for that reason is not on point. It is also a case in which a county's right to oppose the construction of a nuclear power plant on behalf of its citizens before administrative agencies involved matters of broad public and political interest and concern and has broad public policy implications.

Finally, *Borough of Lansdale v. PP & L, Inc.*, 426 F. Supp. 2d 264 (E.D. Pa. 2006), cited in Brief at 18, involved a joint petition by a utility, several Pennsylvania municipalities, and several state agencies to obtain approval of a settlement in which the petitioners resolved disputes arising out of Pennsylvania's adoption of a new policy deregulating the market for electricity.

In all three of these cases, the courts found that defendants had made protected "petitions for redress" because the defendants had asked for, or had asked to shape, a government policy. In contrast, Westinghouse's communications to the NRC simply asked for technical approval of a specific device under a pre-established policy, the MUR Uprate program, that Westinghouse had not initially requested and did not seek to change.

Thus, the Defendants' highly technical communications with non-policy making staff of the NRC in an effort to have a Topical Report approved had no political or policy making implications and are therefore not covered by the First Amendment right to petition.   Thus, Defendants communications are not immunized by *Noerr-Pennington*.

    **2.**    **<u>*Noerr-Pennington* does not apply because the restraint in question was not imposed by government action but rather by private action.</u>**

The first case which established the first prong of the *Noerr-Pennington* doctrine - *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) - explains that the doctrine protects statements made to the government seeking the imposition of trade restraints; it does not protect statements made to private actors.   *Noerr* involved a battle for market share between railroads and trucking companies, in which the railroads paid for "a publicity campaign against the truckers designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business." *Id.* at 129.   The Supreme Court distinguished between this kind of publicity campaign, in which the railroads ***asked the government to impose trade restraints*** on its trucking rivals, and the classic kind of antitrust endeavor, in which the railroads would have directly restrained their customers (through tying contracts, deceit, etc.) from dealing with truckers.

The *Noerr* Court stated that "***where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action***, no violation of the [Sherman] Act can be made out." *Id.* at 136.   And it noted that "There are no specific findings that the railroads attempted directly to persuade anyone not to deal with the truckers." *Id.* at 142.   These statements indicated that if the railroads had directly contacted customers to restrain them from trading with truckers, the railroads would have been engaging in "private action" and would have been subject to antitrust liability.

Four years later, the Supreme Court reaffirmed *Noerr* when it decided *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965). In *Pennington*, the owners of a small coal mine alleged that the mine workers' union and some larger mines had conspired to persuade the federal Secretary of Labor to impose certain wage and other requirements on the mining industry that would effectively drive small mines out of business. The small mine owners sued in antitrust and prevailed at trial, and the Sixth Circuit affirmed, but the Supreme Court reversed, on the grounds that by lobbying the Secretary of Labor to regulate their industry, the union and larger mines had engaged in the kind of political activity protected by *Noerr*. Thus, *Pennington* involved a government-imposed restraint on trade and held that there is no antitrust liability for successfully petitioning government to impose such a restraint.

Caldon's initial Complaint and its Amended Complaint both allege that Caldon was harmed by Westinghouse's "false and disparaging claims [that] were made in regulatory submissions which were widely disseminated to customers and potential customers." ECF No. 1 at ¶ 63; ECF No. 263 at ¶ 84. In other words, Caldon claims that Westinghouse submitted the same false Topical Report to the NRC and to customers: first to the NRC as a regulatory submission, and then to customers as a marketing tool. Westinghouse's motion for summary judgment never disputes this.

When Westinghouse moved to dismiss the initial Complaint, it argued that because Westinghouse's statements appeared in a regulatory submission before they were made to customers, those statements were "petitions" to the government and were protected by the *Noerr-Pennington* doctrine. Westinghouse's motion for summary judgment makes the same argument:

| Brief in Support of Motion to Dismiss ECF No. 9, p. 27 | Brief in Support of Motion for Summary Judgment ECF No. 303, p. 5 |
|---|---|
| "To the extent that Plaintiff's claims … are predicated on statements made to the NRC, they are barred as a matter of law by the *Noerr-Pennington* doctrine." | "Westinghouse is entitled to partial summary judgment on all of Caldon's claims to the extent they allege or are premised on … communications with the NRC …." |

This Court rejected Westinghouse's argument at the pleadings stage, and it should reject the argument again at summary judgment. Consistent with *Noerr*'s distinction between government and private action, this Court found that Westinghouse's motion to dismiss "ignore[d] the thrust of Plaintiff's … claims, which is that the statements complained of were allegedly provided to consumers of the UFM devices offered by both the plaintiff and the defendants." *Caldon*, 515 F. Supp. 2d at 574.

The two Third Circuit cases relied on by Westinghouse, *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119 (3d Cir. 1999) and *Armstrong Surgical Ctr. Inc. v. Armstrong County Memorial Hospital*, 185 F.3d 154 (3d Cir. 1999), both quoted the following language from *Noerr*:

> "Where restraint or monopolization is the result of valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out."

*Cheminor*, 163 F.3d at 122; *Armstrong Surgical Center*, 185 F.3d at 159.

Thus, both cases involved a restraint imposed by valid government action - the imposition of import duties by the FTC in *Cheminor* and the state regulation of competition among hospitals in *Armstrong Surgical Center*. The discussion of exceptions to *Noerr-Pennington* in those cases must be viewed in the context of government imposed restraints. Thus, when the *Cheminor* court says it refuses to "carve out a new [fraud or misrepresentation] exception to the broad immunity that *Noerr-Pennington* provides," 168 F.3d at 123, it is speaking about an exception to the immunity that arises from a government imposed restriction.

The *Armstrong Surgical Center*[2] court's similar statement questioning when misrepresentations in non-sham petitioning are ever sufficient to strip a defendant of *Noerr-Pennington* immunity is also made in the context of a case involving immunity arising out of a government imposed restraint on competition.

But, if the restraint in question is imposed by private action and not by government action, *Noerr-Pennington* immunity does not apply in the first place and therefore there is no need to even discuss the questions of exceptions to it. Since Westinghouse has conceded that in this case Caldon has not been injured by any action of the NRC (Brief at 21 and WH Facts at 19-21, 37), it has conceded away the applicability of *Noerr-Pennington* immunity and therefore Westinghouse's discussion of the Third Circuit view of exceptions to *Noerr-Pennington* is as misplaced as it is irrelevant.

No government imposed restraint, no *Noerr-Pennington* immunity. The analysis is no more complicated than that.

Because the relevant evidence – including evidence presented by Westinghouse – indicates that this litigation involves private action, not government action, to restrain trade, Westinghouse's second request for application of the *Noerr-Pennington* doctrine must be denied.

3.    **Since the First Amendment right to petition does not cover petitions based on known falsehoods, *Noerr-Pennington* does not apply in the first instance.**

In the first line of its Brief, Westinghouse states that *Noerr-Pennington* immunity is based on the fundamental First Amendment right to petition the government for redress of grievances. ECF No. 303 at p. 1. Caldon agrees with this proposition. However, Caldon disagrees with the next statement in Westinghouse's Brief, that the First Amendment protects the

---

[2] *Armstrong Surgical* holds that where a restraint is imposed by valid governmental action, liability cannot be imposed on private parties who urge or request the governmental action.

use of speech "that attempts to obtain *any* governmental action or inaction." *Id.* (emphasis added).

Martha Stewart attempted to persuade the government not to prosecute her for securities fraud by using speech that was dishonest and included false statements. She was prosecuted, convicted, and served time for violating 18 U.S.C. § 1001, which makes it a crime to willfully falsify, conceal, or cover up a material fact; to make any false statements or representations; or to make any false writing to a governmental department or agency. *See United States v. Stewart,* 323 F. Supp. 2d 606, 609 (S.D.N.Y. 2004).

The fact that Ms. Stewart made the false statements in an effort to persuade the government not to prosecute her – *i.e.*, "to obtain governmental action or inaction" – did not confer First Amendment protection to her false statements. So Westinghouse's initial statement of the scope of the First Amendment right to petition is obviously overly broad. The First Amendment clearly does not protect all speech intended to obtain governmental action or inaction – it does not protect false speech made to "any department or agency of the United States." 18 U.S.C. § 1001.

If Westinghouse is correct in claiming that the submission of the CROSSFLOW Topical Report constitutes speech protected by the First Amendment right to petition even if it was false or materially incomplete, then Westinghouse could never be prosecuted under 18 U.S.C. § 1001 for making materially false statements in its submission or for concealing material facts from the NRC, no matter how material the false statements or concealed information might be. Nor could it even be sanctioned under 10 C.F.R. § 50.5, which prohibits "deliberate misconduct" defined as deliberately omitting or misstating any material fact in communications with the NRC.[3]

---

[3] Thus, Westinghouse is in reality challenging the constitutionality of 18 U.S.C. § 1001 and 10 C.F.R. § 50.5 as applied to the facts alleged here. As such, Westinghouse is required under Fed. R. Civ. P. 5.1 to notify the Attorney

Thus, pure logic and common sense require the rejection of the Defendants' *Noerr-Pennington* argument.  As the following discussion demonstrates, so does the case law.

Westinghouse's brief begins with an overview of what it claims is the law regarding the *Noerr-Pennington* doctrine.  Westinghouse asserts that there are "just two limitations on the broad *Noerr-Pennington* immunity":  an exception for "sham" litigation, and a "marketplace boycott" exception.  Brief at 2, citing *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) (limning test for the "sham" exception); *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990) (doing same for the "market boycott" exception).

Westinghouse claims that "The Supreme Court has never spoken on the issue of whether a generally applicable limitation on *Noerr-Pennington* immunity exists based on the defendant's alleged misrepresentations or fraud in securing government action or inaction."  Brief at 2.  To the contrary, the Supreme Court has spoken on the issue on four separate occasions.  The Court has never ***held*** that fraud does not enjoy *Noerr-Pennington* immunity, but it has repeatedly suggested it in dicta.

In *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965), the plaintiff alleged that the defendant, by submitting fraudulent information to the U.S. Patent Office, deprived the plaintiff of business and committed an antitrust violation.  The trial court dismissed the claim, but the Supreme Court reversed, stating that proof that a defendant was "knowingly and willfully misrepresenting facts to the Patent Office ... would be sufficient to strip [it] of its exemption from the antitrust laws."  *Id.* at 177.

In *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972), one group of trucking companies allegedly filed a series of baseless lawsuits and regulatory actions,

General and should be required to notify the NRC to give that agency the opportunity to defend the constitutionality of its regulation.

not really hoping to prevail on the merits, but simply to obstruct its competitors' attempts to do business by clogging the court and agency dockets. The trial court dismissed the complaint on *Noerr-Pennington* grounds, but the Supreme Court held that the doctrine did not apply when "administrative and judicial processes have been abused." *Id*. at 513. It reasoned that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process [and] cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'" *Id*.

In *Allied Tube*, 486 U.S. 492 (1988), which was discussed at some length above, the Supreme Court held that a competitor's attempts to pack a standards-setting body did not enjoy *Noerr-Pennington* immunity, because:

> The validity of … efforts [to influence governmental action], and thus the applicability of *Noerr* immunity, varies with the context and nature of the activity. A publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods. *But in less political arenas, unethical and deceptive practices can constitute abuses* of administrative or judicial processes that may result in antitrust violations.

*Id*. at 499-500 (emphasis added) (citations omitted).

Finally, in *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993), PRE developed a system for showing movies in hotels, and Columbia (a movie studio) sued PRE for copyright infringement. PRE then counterclaimed in antitrust, arguing that Columbia's suit was the sort of "baseless" and "sham" litigation that the *Cal Motor* Court held could be a basis for antitrust liability. The trial court dismissed both parties' claims, and the Supreme Court affirmed that decision and used its opinion to create a two-part test for what "sham" litigation is: a) an objectively baseless claim; that b) seeks to use governmental process (as opposed to the outcome of that process) to harm a competitor. *Id*. at 60-61.

After setting forth its test for sham litigation, the *PRE* Court wrote a footnote which stated that its opinion involved sham ***litigation***, and not other kinds of misconduct in other fora:

> In surveying the 'forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations,' we have noted that 'unethical conduct in the setting of the adjudicatory process often results in sanctions' and that 'misrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process.' ***We need not decide here whether and, if so, to what extent Noerr permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations.***

*Id*. at 61 n.6 (emphasis added) (quotations of *Cal Motor* and citation to *Walker Process* omitted).

It is technically true, as Westinghouse contends, that none of these cases "has ever recognized a broad-based fraud exception to *Noerr-Pennington* immunity." Brief at 5. That is because none of these cases has presented the Supreme Court with an opportunity to recognize "a broad-based fraud exception." Still, the fact that the Court has repeatedly indicated that fraud may not be protected at all is telling. The *Allied Tube* Court's statement that "in less political arenas … deceptive practices can constitute abuses of administrative . . . processes that may result in antitrust violations" does not create a "broad-based fraud exception"; but the statement indicates that fraud does not enjoy *Noerr-Pennington* immunity at all in non-political administrative settings. 486 U.S. at 500.

While the Supreme Court has never explicitly decided whether fraud to a government agency is eligible for protection under the First Amendment and the *Noerr-Pennington* doctrine, the circuit courts have gone much further: they have held that misrepresentations are actionable in antitrust when made outside of the legislative context. These circuit court decisions do not attempt to carve out an "exception" like the "sham" exception or the "market boycott" exception; they simply state that *Noerr-Pennington* does not protect fraud. Another way to say it is that the First Amendment does not protect knowingly false statements to a government agency or department.

The Federal Trade Commission, in holding that misrepresentations to the California Air Resources Board were not entitled to *Noerr-Pennington* immunity, surveyed the law and concluded that:

> Although Supreme Court law remains unsettled, the weight of lower court authority, spanning more than thirty years, has recognized that misrepresentations may preclude application of *Noerr-Pennington* in less political arenas than the legislative lobbying at issue in *Noerr* itself. For example, courts have refused to apply the doctrine to conduct involving misrepresentations to a state railroad commission in the setting of natural gas production quotas; to the Interstate Commerce Commission in a ratemaking context; to a state health planning agency considering an application for a certificate of need ("CON"); to the Food & Drug Administration involving its pharmaceutical drug approval process; and to state securities administrators and the federal courts with respect to allegations of franchise law violations, racketeering, and securities fraud. The United States Courts of Appeals for the District of Columbia Circuit, the Second Circuit, the Fifth Circuit, the Sixth Circuit, the Seventh Circuit, the Eighth Circuit, the Ninth Circuit, the Eleventh Circuit, and the Federal Circuit, expressing their views in diverse terms and in varying settings, all have indicated that in some contexts misrepresentations to government may vitiate *Noerr-Pennington* protection.

*In the Matter of Union Oil Company of California* ("*Unocal*"), 138 FTC 1 (July 7, 2004) (numerous citations omitted).

The *Unocal* opinion, and the numerous cases cited therein, provides an exhaustive demonstration of an intuitive proposition – that the *Noerr-Pennington* doctrine does not give anyone the right to lie to the government and escape antitrust liability for the consequences. Two cases from the DC Circuit, each of which involved an agency not unlike the NRC, will illustrate the point:

In *Israel v. Baxter Laboratories, Inc.*, 466 F.2d 272 (D.C. Cir. 1972), the plaintiff sought FDA approval of his drug Cothyrobal, which he thought would compete with defendants' approved drug Choloxin.  He alleged that defendants actively misled the FDA about and caused it to deny approval to Cothyrobal.  The district court dismissed the complaint on *Noerr-Pennington* grounds, but the DC Circuit reversed.  The DC Circuit concluded that "No actions

which impair the fair and impartial functioning of an administrative agency should be able to hide behind the cloak of an antitrust exemption." *Id.* at 278.

In *Whelan*, 48 F.3d 1247, the DC Circuit reversed a district court's ruling, at summary judgment, that defendants' alleged misstatements about plaintiff to the Maryland Board of Securities were protected under *Noerr-Pennington*. The DC Circuit stated: "We see no reason to believe that the right to petition includes a right to file deliberately false complaints .... However broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods" *Id.* at 1254-55.

In summary, the Supreme Court has repeatedly stated that fraudulent misrepresentations may not be protected by the *Noerr-Pennington* doctrine. The vast majority of the circuit courts have adopted, not an exception, but a rule that fraud or deception to a regulatory agency does not enjoy First Amendment protection in the first instance and therefore does not enjoy *Noerr-Pennington* protection. This Court can and should apply this majority rule, find that the Defendants' contacts with the NRC are not protected by the First Amendment, and deny Westinghouse's motion for summary judgment on that ground. While the Third Circuit has not yet explicitly adopted this majority rule, it has never rejected it, as this brief will now show.

### 4. If squarely presented with this case, the Third Circuit would hold either that *Noerr-Pennington* does not apply to known falsehoods, or that they are excepted from the application of *Noerr-Pennington*.[4]

As pointed out in section 2 of this Brief, both Third Circuit cases relied on by Westinghouse to support its argument that the Third Circuit will not recognize a misrepresentation exception to *Noerr-Pennington* immunity, involved restraints imposed by

---

[4] In section 2 of this Brief it was shown that when the Third Circuit in *Cheminor* and *Armstrong Surgical Center* discussed exceptions to *Noerr-Pennington*, it meant exceptions to an immunity arising from a restraint imposed by governmental action. Since this case does not involve a government imposed restraint, the Third Circuit's discussion of exceptions in those cases is irrelevant and has no application to this case. The discussion in this section 4 of this Brief proceeds as if this case did in fact involve a restraint imposed by governmental action.

governmental action.   Westinghouse has conceded that this case does not involve a restraint imposed by governmental action.   That concession should end the analysis, for if the restraint is not imposed by a government, then there is no *Noerr-Pennington* immunity, and there is no need to go on to determine whether any exception to *Noerr-Pennington* might apply.   Westinghouse's discussion of whether *Cheminor* and *Armstrong Surgical Center* rejected a misrepresentation exception is therefore a case of putting the cart before the horse, and is largely irrelevant to the proper disposition of Westinghouse's *Noerr-Pennington* argument.   For, in both of these cases the court was discussing exceptions to an immunity that arose out of a restraint imposed by government action.

Although Caldon believes that there is no need to attempt to fit this case into a misrepresentation, sham or *ex parte* exception, out of an abundance of caution, it will nevertheless now address the question whether, if this case were a government restraint case, the Third Circuit would nevertheless rule in favor of Caldon on the *Noerr-Pennington* issue.

Because the great weight of authority, as set forth exhaustively in *Unocal*, supports the view that fraudulent statements to a government agency are not protected by the *Noerr-Pennington* doctrine, Westinghouse grasps at the only straw within reach:  the fact that the Third Circuit has not formally joined the long list of appellate courts to adopt this view.   But Westinghouse goes too far when it says that "the Third Circuit has expressly rejected … a generally-applicable limitation … based on the defendant's alleged misrepresentations or fraud in securing government action or inaction."   Brief at 2-3.   The Third Circuit has never been asked to create a "generally-applicable limitation," so it has never "expressly rejected" one.   It has been asked to apply the law to specific factual circumstances, and it has done so.

A close look at three Third Circuit decisions, two of which Westinghouse cites extensively, will demonstrate that they do not "expressly reject" the notion that fraud in a federal regulatory context will not enjoy *Noerr-Pennington* protection.

        a.      **The *Cheminor* decision is factually distinguishable, and its language actually supports Caldon's position here.**

In the first decision, *Cheminor*, Ethyl Corp. persuaded the federal International Trade Commission that Cheminor Drugs was planning to "dump" subsidized Indian ibuprofen on the United States market and should be blocked from doing so by punitive tariffs. Cheminor filed antitrust and state law tort claims against Ethyl for allegedly making misrepresentations to the ITC about its plans to "dump." The district court dismissed Cheminor's claims at summary judgment, and the Third Circuit affirmed. The Third Circuit held that the ITC ***did not rely on Ethyl's alleged misrepresentations***, and that because the misrepresentations "did not taint the 'core' of Ethyl's … petition … Ethyl is entitled to First Amendment immunity from antitrust liability for its petition." 168 F.3d at 127 (emphasis added).

        i.      ***Cheminor*'s holding is distinguishable.**

*Cheminor*'s holding makes *Cheminor* distinguishable from this litigation. Under *Cheminor*, Westinghouse would enjoy *Noerr-Pennington* immunity if it could show that its alleged misrepresentations about CROSSFLOW's accuracy were ignored by the NRC or were not material to the NRC's decision to approve CROSSFLOW as a high-accuracy flow meter. But Westinghouse does not even attempt to make such an argument. It knows that its statements about CROSSFLOW's accuracy were directly material to the NRC's decision to approve it. For this reason, *Cheminor* is not on point and does not support Westinghouse's argument.

        ii.      ***Cheminor*'s dicta supports Caldon's position.**

Of course, Westinghouse does not cite *Cheminor* for its holding. Rather, Westinghouse cites it for its dicta. In the pages leading up to its holding, the *Cheminor* panel discussed *PRE*'s

two-part test for "sham" litigation, noted that *PRE* did not address "how alleged misrepresentations affect *Noerr-Pennington* immunity or the sham exception to *Noerr-Pennington* immunity," and then stated that "We decline to carve out a new exception to the broad immunity that *Noerr-Pennington* provides." *Id.* at 122-23. In other words, *Cheminor* decided to apply *PRE*'s two-part test for "sham" litigation to assess whether Ethyl's claims to the ITC would enjoy *Noerr-Pennington* immunity. *Id.* at 123. Westinghouse cites this to show that the Third Circuit "expressly rejected" a separate fraud exception. Brief at 3.

However, a closer examination of *Cheminor's* dicta suggests that it is not helpful to Westinghouse, because the court repeatedly indicated that material misrepresentations (like Westinghouse's submissions to the NRC) are not entitled to *Noerr-Pennington* immunity.

On the issue of whether material misrepresentations to a governmental agency are protected by the *Noerr-Pennington* doctrine, here is what *Cheminor* actually said:

> If the government's action was not dependent upon the misrepresented information, the misrepresented information was not material and did not go to the core of Ethyl's petition. In sum, *a material misrepresentation that affects the very core of a litigant's (here Ethyl's) case will preclude Noerr-Pennington immunity*, but not every misrepresentation is material to the question of whether a petition such as Ethyl's had an objective basis.

*Cheminor*, 168 F.3d at 124.

And just in case anyone thought the court did not give much thought to the underscored language, it essentially repeated it in footnote 12 of its opinion:

> Our approach in requiring that misrepresentations must be *material* to bar *Noerr-Pennington* immunity is consistent with the two other courts of appeals that have considered the issue.

*Id.* at 124 n.12 (citations omitted, emphasis added).

Thus, in two places the *Cheminor* court, using very clear language, said that *Noerr-Pennington* immunity does not protect material misrepresentations made to an administrative agency. Because Westinghouse does not even attempt to argue that its alleged

- 23 -

misrepresentations were not material, it seems that *Cheminor* actually sinks its *Noerr-Pennington* argument.  While it is true that this statement was made in the context of deciding whether the sham exception applied, the language itself is much broader and says quite explicitly that *Noerr-Pennington* immunity does not protect material misrepresentations.

The Third Circuit has never held or even suggested that the making of material knowing falsehoods to a federal department or agency (an apparent violation of 18 U.S.C. § 1001) is protected by the First Amendment right to petition.  As pointed out above, the *Cheminor* court explicitly stated that a material misrepresentation will bar *Noerr-Pennington* immunity.  In the same footnote 12 where it made that statement, the *Cheminor* court cited with approval *Whelan v. Abell*, 48 F.3d 1247 (D.C. Cir. 1995), which said that the First Amendment right to petition does not cover the making of knowing falsehoods.  *Cheminor* also cited *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965) in footnote 12. *Walker Process* has a number of similarities to this case.  There, Walker Process alleged "that Food Machinery obtained the patent by knowingly and willfully misrepresenting facts to the Patent Office (at 177).  Here, Caldon alleges that the Defendants obtained approval for their Topical Report by misrepresenting facts to the NRC.  There, Walker Process alleged that if Food Machinery obtained its patent by fraud and thereafter used its patent to exclude Walker from the market, it would be a violation of Section 2 of the Sherman Act.  Here, Caldon claims that the Defendants violated Section 2 of the Sherman Act when they obtained their Topical Report approval by deception and thereafter used its approval to exclude Caldon from the market through deception.

Another similarity between *Walker Process* and this case is that in both cases the agency's decision was based on non-public information received from the applicant.  Here, although Caldon submitted all relevant publicly available information, this information was

deemed to be outdated and superceded by the non-public proprietary information submitted by Westinghouse. R.E. ¶¶ 48-61. Since no one other than the Defendants had knowledge of that proprietary information, the NRC reviewer was necessarily dependent on the truth of what he was being told by the Defendants. Finally, in both *Walker Process* and this case the type of information submitted and reviewed was highly technical in nature.

Thus, *Cheminor*'s language and the cases it cites actually support Caldon's position in this case.

**b.   The _Armstrong_ decision is factually distinguishable, and its language actually supports Caldon's position here.**

In *Armstrong*,[5] the plaintiff proposed to build a surgical center in Kittanning, Pennsylvania. To do so, it needed to win approval from a state commission, which, pursuant to state law, had to certify that there was a need for such a facility in the community. The plaintiff claimed that to prevent competition, a local hospital falsely claimed that it was about to open its own surgical facility. This allegedly induced the state commission to find that the community did not need two surgical facilities and to deny the plaintiff's proposal to build one. The Third Circuit ruled that even if the hospital made these false statements, it could not be liable for an antitrust violation.

*Armstrong* followed *City of Columbia v. Omni Outdoor Advertising*, 499 U.S. 365 (1991). In *Omni*, a local billboard company conspired with a local municipality to establish zoning regulations that limited billboards in a way that benefitted it and harmed its out-of-town competitors. The Supreme Court held that the billboard company was not subject to antitrust liability, because state action that reduces competition in the hope of creating some public benefit can never be the basis of antitrust liability, even if it is the result of a conspiracy. 499

---

[5] *Armstrong* was a 2-1 decision with a strong and thoughtful dissenting opinion. The dissent reads *Cheminor* as Caldon does here.

U.S. at 374 (following *Parker v. Brown*, 317 U.S. 341 (1943)).  The Third Circuit held that the state medical commission was engaged in such state action (*i.e.*, it was directly regulating the market for surgery centers) when it decided that Armstrong County would not benefit from the competition that the proposed surgical center would provide.  The Third Circuit held that under *Omni*, the commission's action could not be the basis for antitrust liability against the hospital.[6]

And as with *Cheminor*, the *Armstrong* court's dicta regarding the existence of a misrepresentation "exception" to the *Noerr-Pennington* doctrine does not benefit Westinghouse at Caldon's expense.  The *Armstrong* court begins its discussion by suggesting that *Omni* "casts doubt on whether [a misrepresentation] exception exists under any circumstances."  185 F.3d at 160.  But it ends that discussion by suggesting, as even Westinghouse acknowledges, that "limitation on *Noerr-Pennington* may exist where the defendant has made misrepresentations to the government in the context of an *ex parte* decision-making process."  Brief at 3, citing *Armstrong*, 185 F.3d at 164 n.8.

> **c.      The Third Circuit's most recent statement on the *Noerr-Pennington* doctrine reiterates that deception to an entity other than the legislature can be grounds for antitrust liability.**

Finally, it is worth noting that after 1999, when the Third Circuit decided both *Cheminor* and *Armstrong*, it stated in 2007 that "'in less political arenas,' however, such as [petitions to a standards-setting body], 'unethical and *deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations.*'"  *Broadcom*, 501 F.3d at 308 (quoting *Allied Tube*, 486 U.S. at 500) (emphasis added).  While the decision in *Broadcom* involved misrepresentations to a standards-setting body and, to that extent, is just as distinguishable from this litigation as *Cheminor* and *Armstrong* are, *Broadcom* is nevertheless

---

[6] *Armstrong Surgical Center* is really a *Parker v. Brown* state action case which is based on the principle that the Sherman Act was not intended to interfere with a state's internal regulation of competition.  As such it is not a First Amendment case and it is inapposite to this case which involves a federal agency and not a state.

the Third Circuit's most recent statement on whether misrepresentations enjoy *Noerr-Pennington* immunity.[7]   *Broadcom* suggests (and, in the standards-setting context, holds) that misrepresentations do not enjoy such immunity.

For the reasons set forth above, *Cheminor* and *Armstrong* are both factually distinguishable from this litigation:   they based their conclusions on facts (lack of material misrepresentations in *Cheminor*; state action in *Armstrong*) which have no counterpart here.

Moreover, both *Cheminor* and *Armstrong* acknowledge that misrepresentations may not be immune from antitrust liability.   *Cheminor* stated that "a material misrepresentation that affects the very core of a litigant's case will preclude *Noerr-Pennington* immunity." 168 F.3d at 124.   *Armstrong* stated that misrepresentations can be subject to liability when made in the context of *ex parte* or *Walker Process* proceedings.   185 F.3d at 164 n.8.

In summary, relevant case law from the Supreme Court (*Walker Process*, *Cal Motor*, *Allied Tube*, and *PRE*) consistently suggests, but does not hold, that the *Noerr-Pennington* doctrine does not immunize misrepresentations to regulatory bodies like the NRC.   Relevant case law from other circuits (*see Unocal*, *Israel*, *Whelan*) goes further and creates a majority rule that knowing falsehoods are not protected by the First Amendment and the *Noerr-Pennington* doctrine.   And case law from the Third Circuit (*Cheminor*, *Armstrong*, and *Broadcom*) is not contrary to the majority rule, and contains dicta that is consistent with that rule.   It is respectfully submitted that with this background, if squarely presented with this case, the Third Circuit would adopt the majority rule and find that Westinghouse's misrepresentations to the NRC do not enjoy *Noerr-Pennington* immunity.

---

[7] Westinghouse cites another pre-*Broadcom* decision, *Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123 (3d Cir. 2005), for the proposition that when the *Noerr-Pennington* doctrine applies, it bars Lanham Act claims. Brief at p. 12. But *Santana* left that question open, 401 F.3d at 135, and it remains open.

**5.      Even if the Court adopts Westinghouse's restrictive view of the exceptions to _Noerr-Pennington_ immunity, the _Walker Process_ exception applies because the NRC proceedings at issue were effectively _ex parte_.**

If this Court declines to adopt the majority rule (_i.e._, that Westinghouse's alleged misrepresentations to the NRC are not protected by the First Amendment right to petition clause and therefore do not enjoy _Noerr-Pennington_ immunity as a matter of law), it will nevertheless reach the same conclusion if it applies Westinghouse's narrow construction of _Walker Process_.

Westinghouse's brief explains that "an additional, but very narrow, limitation on _Noerr-Pennington_ immunity may exist where the defendant has made misrepresentations to the government within the context of an _ex parte_ decision-making process, such as that relating to patent applications, in which the government was 'wholly dependent' on the applicant for the facts." Brief at 3, citing _Walker Process_, 382 U.S. 172.

Westinghouse argues that this exception cannot apply to this litigation, because "the NRC's decision to approve the CROSSFLOW Topical Report was the product of a thorough, seven-month investigation and substantive review of the AMAG CROSSFLOW UFM that included significant input from Caldon." Brief at 24. But Westinghouse neglects to mention that the NRC's decision was based on Westinghouse's proprietary information, which was not available to Caldon. While the NRC proceedings were technically open to Caldon, they were functionally _ex parte_, because Caldon had no opportunity to review, evaluate and comment on some 85% of the Topical Report, which Westinghouse claimed was proprietary. R.E. at ¶¶ 53-54. On numerous occasions, Caldon would raise a concern or objection to the NRC, only to be told that the NRC's decision was based on proprietary information that Caldon could not challenge. _See_ R.E. at ¶¶ 32-68. To provide just one example, Westinghouse stated in 2003 that: "[T]he fact that WEC/AMAG have guarded the release of cross correlation/Crossflow intellectual property makes it difficult for most individuals … that do not have full access to the

- 28 -

technical details provided to the NRC to meaningfully comment on Crossflow ultrasonic flowmeter system performance." *Id*. at ¶ 65.

In short, Westinghouse claimed in 2003 that Caldon was unable to "meaningfully comment" to the NRC on CROSSFLOW, because the NRC based its decision on secret information that Caldon could not see. Westinghouse should not be heard to argue now, in 2012, that Caldon had a full and meaningful opportunity to comment to the NRC about CROSSFLOW. As required at summary judgment, Caldon has presented credible evidence that raises a material dispute of fact concerning whether the NRC's review of CROSSFLOW was an "*ex parte*" proceeding, such that *Walker Process* would apply, and Westinghouse's statements to the NRC would be grounds for antitrust liability. Accordingly, Westinghouse's Motion for Summary Judgment on *Noerr-Pennington* grounds should be denied.

## CONCLUSION

For the foregoing reasons, Westinghouse's motion for partial summary judgment on *Noerr-Pennington* grounds should be denied.

Respectfully submitted,

PICADIO SNEATH MILLER & NORTON, P.C.

By:    /s/ Anthony P. Picadio
        Anthony P. Picadio, Esquire
        Pa. I.D. No. 01342
        Jason A. Spak, Esquire
        Pa. I.D. No. 89077
        Four Gateway Center
        444 Liberty Avenue, Suite 1105
        Pittsburgh, PA  15222
        (412) 288-4000
        *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing PLAINTIFF'S BRIEF IN

OPPOSITION TO DEFENDANTS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT ON

NOERR-PENNINGTON GROUNDS was electronically filed and is available for viewing and

downloading from the ECF system, and was sent to all counsel of record this 26th day of

March, 2012, via electronic service, addressed as follows:


David L. McClenahan, Esquire
James E. Scheuermann, Esquire
K&L Gates LLP
K&L Gates Center
210 Sixth Avenue
Pittsburgh, PA  15222-2613
dmcclenahan@klgates.com
james.scheuermann@klgates.com
*(Counsel for Westinghouse Electric Company, LLC)*


Lindsay Mork, Esquire
Smith Cohen & Mork
Fort Pitt Commons Building
445 Fort Pitt Boulevard, Suite 210
Pittsburgh, PA  15219-1308
lsmork@lawscm.com
*(Counsel for Advanced Measurement & Analysis Group, Inc.)*



PICADIO SNEATH MILLER & NORTON, P.C.

/s/ Anthony P. Picadio

_____
Anthony P. Picadio, Esquire
Jason A. Spak, Esquire